730 So.2d 1251 (1998)
Derell YOUNG
v.
STATE.
CR-95-2195.
Court of Criminal Appeals of Alabama.
October 2, 1998.
Certiorari Quashed March 19, 1999.
*1252 Virginia A. Vinson, Birmingham, for appellant.
Bill Pryor, atty. gen., and Jack W. Willis, asst. atty. gen., for appellee.
Alabama Supreme Court 1980116.

On Application for Rehearing
COBB, Judge.
This court's opinion released on May 29, 1998, is hereby withdrawn and the following opinion is substituted therefor.
Derell Young appeals from his conviction of felony murder as a lesser included offense to the offense of murder made capital because it was committed during a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975. Young was tried before a jury on the charge that he shot and killed Anthony Williams during an armed robbery in which $6 was stolen from the victim. Following the guilty verdict, the trial court adjudicated Young guilty and sentenced him to life imprisonment. This appeals follows.

Facts
The evidence presented at trial tends to show the following. Sometime after dark on March 18, 1995, Young was riding in an automobile in Pratt City with three fellow members of the "Hilltop Hustlers," a neighborhood gang. At some point, the group saw Anthony Williams walking along the street. They turned the automobile around, and Young and Quincy Jemison got out of the backseat of the car and approached Williams. State witness Rodney Rice, who was in the front seat of the car, testified that when he got out of the car, Young was armed with a TEC-9 semi-automatic pistol. In a statement to police, and again at trial, Young said that Jemison had the weapon. In any event, the two then 17-year-old boys confronted Williams in an alley, ordered him to lie on the pavement, took $6 from him, and then shot him twice. Williams died on March 26, 1995, from complications from the gunshot wounds.
Witnesses could not identify which youth actually shot Williams, but they testified that, after hearing the gunshots, they saw one of the young boys running, with the other following. Young told police upon his arrest and testified at trial that Jemison had the gun and rifled through Williams's pockets, and that he then ordered Young to run back to the car. Young stated that he heard the gunshots as he was running back to the car, and that Jemison followed him to the car.

I.
Young argues that the trial court erred by finding that he had not established a prima facie case of racial discrimination in the prosecution's use of its peremptory challenges, and that the court had, therefore, erred by not requiring the prosecutor to offer raceneutral reasons for her strikes, pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The record shows that the prosecution used 7 of its 15 strikes against black veniremembers, thereby striking 7 of the 14 black veniremembers remaining after challenges for cause. Ultimately, five black jurors sat on the jury.
After reviewing the strikes against black veniremembers by both sides and noting the racial composition of the jury, the trial court ruled that Young had not made a prima facie case for discriminatory striking. It is clear from the record that the basis for Young's Batson motion was solely numbers:
"MR. WILKINSON [trial counsel]: ... I think that the Court's declaration that we had not made out a prima facie case is not the law anymore. I think it's in error, and we respectfully except to it, in the court's not requiring the State to give specific reasons.
"THE COURT: What do you think the law is, Louis?
"MR. WILKINSON: I think the law is just
"THE COURT: Just by virtue of making a motion I'm required to make the State give their reasons?

*1253 "MR. WILKINSON: Yes, sir. I think there's a pretty recent case out. And I do think it's an error where they have struck 7 out of 14. If you take a look at their numbers, half of their strikes, 7 blacks out of 14, yes, sir, I think numbers alone require them to give specific reasons for the strikes."
(R. 92-93.)
Young argues on appeal that the sole reason for the trial court's determination that he had not made a prima facie case of discrimination was a comparison of the percentage of blacks sitting on the original venire, to the percentage of blacks that ultimately sat on the jury. Indeed, the number of black veniremembers before and after the peremptory strikes was the main topic of conversation between the trial court and the parties at the time of the ruling. However, the trial court recorded its rationale for its decision on the case action summary:
"Batson motion heard in chambersMs. Vinson [trial counsel] recites that `single' status is not deemed race-neutralDeputy DA Ms. Foster states single status was not sole reason for striking any black venireperson Based upon court's observation of the proceedings and court's extensive trial experience with Ms. Foster, a black female not of a persuasion to strike persons because of racecourt holds that Ms. Vinson's [motion] concerning state's strikes do not comprise a prima facie case for discriminatory striking of any black venireperson, thus, state is not required to state reasons for eliminating any black juror"
(C.R.3-4.)
"In Batson v. Kentucky, supra, the United States Supreme Court set out the components of a prima facie case of racial discrimination in jury selection. In addition to showing that the State used peremptory challenges to remove members of a cognizable group to which he belongs and relying upon the fact that peremptory strikes permit discrimination, a claimant also must show that these facts and any other relevant facts raise an inference that the prosecutor used his strikes in a discriminatory manner. In Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987), the Alabama Supreme Court explained that relevant factors could include, but were not limited to, the following: evidence that the jurors shared only the characteristic of their group membership and were heterogeneous in all other respects; a pattern of strikes against black jurors; past conduct of the prosecutor; type and manner of the prosecutor's questions during voir dire, including lack of questions or meaningful questions; disparate examination of members of the venire; circumstantial evidence of intent due to the use of most challenges to strike blacks; and the use of peremptory challenges to dismiss all or most black jurors."
Madison v. State, 718 So.2d 90 (Ala.Cr.App. 1997).
Although Young argued that the prosecutor's reasons were merely a pretext to exclude black, single persons by showing that some of the black veniremembers who were struck were single, Young could compare their marital status only with two widowers, one black and one white, who were not struck. In other words, except for the widower, white veniremembers who were single were likewise struck. None of the demographic information indicated that the only characteristic the struck veniremembers shared was race or that the prosecutor had used her peremptory strikes in a discriminatory fashion. Young did not offer any evidence to show that there had been a lack of meaningful voir dire directed at black veniremembers, or that the prosecutor had treated black and white veniremembers differently. Nor did Young offer any evidence that the prosecutor had a history of discriminating against black veniremembers. In fact, the trial court found that the prosecutor, a black female, did not have a history of making racially based peremptory strikes.
Young's only ground for his Batson motion was that the prosecutor had used 7 of her 15 strikes to remove blacks from the venire. "Without more, we do not find that the number of strikes this prosecutor used to remove [blacks] from the venire is sufficient to establish a prima facie case of racial discrimination." Ex parte Trawick, 698 So.2d 162 (Ala.1997). "We will not reverse a trial *1254 court's Batson ruling unless it is clearly erroneous. Great deference should be accorded a trial court's Batson ruling." Davis v. State, 718 So.2d 1148 (Ala.Cr.App.1995) (citations omitted), aff'd, 718 So.2d 1166 (Ala. 1998). The trial court's denial of Young's Batson motion was not clearly erroneous.

II.
Young argues that the trial court erred by not suppressing Young's statement to police investigators. Young, who was 17 years old at the time of the offense, was advised of, and waived, his Miranda rights, but he was never advised of his "juvenile Miranda rights" before his interrogation.

A.
Rule 11(B), Ala.R.Juv.P., enumerates the rights of a child who is in custody but who has not yet been questioned. It provides as follows:
"(B) Rights of the Child Before Being Questioned While in Custody. Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
"(1) That the child has the right to counsel;
"(2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided;
"(3) That the child is not required to say anything and that anything the child says may be used against the child;
"(4) That if the child's counsel, parent, or guardian is not present, then the child has a right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so."
The State concedes that Young was not advised of his "juvenile" rights set out in Rule 11(B), but it argues that the trial court correctly ruled that Young was not entitled to the protections offered by Rule 11(B) because he was being investigated for a capital offense and, therefore, that under § 12-15-34.1, Ala.Code 1975, he was not subject to the jurisdiction of the juvenile court but was to be charged, arrested, and tried as an adult.[1] The State argues that because Young was not subject to the jurisdiction of the juvenile court, he was not subject to the Alabama Rules of Juvenile Procedure, and, thus, it argues, he was not entitled to "juvenile Miranda rights."
This identical issue has been resolved in our recent decision in Anderson v. State, 729 So.2d 900 (Ala.Cr.App.1998). We held in Anderson that there was "nothing in the language of § 12-15-34.1, to support the state's contention that the rights granted a child pursuant to Rule 11(B) are extinguished by the fact that a child alleged to have committed an offense enumerated in that statute `shall be charged, arrested, and tried as an adult' and automatically subjected in the jurisdiction of the adult system." The language of § 12-15-34.1 does not divest the child of the protections afforded by Rule 11(B), and it does not change the statutory definition of "child." We will not place upon a police investigator at an interrogation conducted before an arrest or a formal charging, as was the case here, the burden of deciding whether a child should be afforded the rights guaranteed by Rule 11(B). We adopt in full our rationale in Anderson in holding that Young's custodial statement was wrongfully admitted in evidence because Young was not informed that he had a right to communicate with his parent or guardian, as provided in Rule 11(B), Ala.R.Juv.P.
*1255 Although additional analysis is not necessary because we have adopted the rationale of Anderson, the dissent demands a response. The dissenting opinion asserts that the rationale this court applied in Anderson and is now applying in this case amounts to sophistry and illustrates our desire to legislate; however, it is the dissent that appears ready to look beyond the wording of § 12-15-34.1. If the Legislature had wanted children to be "interrogated" as adults, it could have included the word "interrogated" immediately before the words "charged, arrested, and tried as an adult." The statute does not state that a juvenile loses the right to be treated as a juvenile when an offense is alleged to have been committed, but when he or she is charged with one of the offenses enumerated in § 12-15-34.1. In other words, the dissent incorrectly states that "[t]he language of the statute could not be clearer: anyone over 16 who commits any of the listed felony offenses is to be treated as an adult." In fact, the language of this statute actually means that a person 16 years of age or older who is charged with any of the serious felonies listed is to be treated as an adult.

B.
Having determined that the police officer's failure to inform Young of his juvenile Miranda rights was error, we must now determine whether the error in the admission of Young's statement was harmless. Coral v. State, 628 So.2d 954, 973 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). The proper inquiry in determining whether the constitutional error in this case is harmless was set out by the United States Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967):
"In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one....
"... We prefer the approach of this Court in deciding what was harmless error in our recent case of Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 [(1963)]. There we said: `The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Id., at 86-87, 84 S.Ct. at 230.... Certainly error, constitutional error, in illegally admitted highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was not injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in Fahy v. State of Connecticut about `whether there is a reasonable possibility that the evidence complained of did not contribute to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard...."
386 U.S. at 23-24, 87 S.Ct. 824.
"In order for the error to be deemed harmless under Rule 45, [Ala.R.App.P.], the state must establish that the error did not injuriously affect the appellant's substantial rights." Coral v. State, 628 So.2d at 973.
In this case, the State's main witness, i.e., the witness who identified Young as the person who shot and robbed Anthony Williams, was Rodney Rice, an older gang member who was riding in the front seat of the automobile with Young and his friends *1256 the night of the killing. Earlier, a witness had testified that he saw two black youths ordering Williams to "lay down"; he saw one youth bend over and go through Williams's pockets while the other youth stood next to them; and he saw one youth start to run as two shots were fired, with the other youth following closely behind. However, no one could identify the two black youths involved, and no one could identify which youth had been the shooter. However, Rice testified as follows:
"Q: [prosecutor]: What if anything happened when you all saw Anthony Williams?
"A: We saw him and Derell said, `I'm fixing to get that nigger.'
"Q: What happened next?
"A: We went up W [street] about a block or two. We turned down an alley and came back down Court U. We parked the car. Quincy and Derell jumped out, and they went and robbed him.
". . . .
"Q: Did anything happen between the time Quincy and Derell returned to the car?
"A: We heard two gunshots. By then, when we heard the two gunshots, we were making a U-turn, fixing to leave. Quincy came. They ran back to the car. Quincy opened the door and jumped in, then Derell got in behind him.
". . . .
"Q: And when [Derell] got out did he have anything with him?
"A: Well, he had a TEC-9. He had it right here. He came up with it. A TEC-9. A gun.
"Q: Do know where that TEC-9 had been? Was it in the car earlier? Where was it?
"A: He had it on his person.
"Q: Did Quincy Jemison have a gun with him?
"A: No, ma'am. I ain't seen one.
". . . .
"Q: Did you see whether or not Derell did anything with him when he returned to the car?
"A: He had $6.00 in his hand.
". . . .
"Q: What happened then.
"A: I asked him, I said, `Man, why did you shoot him?' He said, `Man, he called my name. He said, "Derell, you know I ain't got nothing. I don't know why you're robbing me."'
". . . .
"Q: Did you ask him anything else?
"A: And then he said, `I wouldn't have shot him if Quincy would have helped me out and wouldn't have been lagging behind.' And that was it."
(R. 217-22.)
The State then introduced Young's statement taken by a police officer with the homicide unit of the Birmingham Police Department. When asked about the shooting, Young responded:
"A: Well, I was a part of it and we tried to rob Big Amp [Anthony Williams]. After we got to robbing him my homeboy told me to run and I ran.
"Q: [Investigator]: Who else was with you?
"A: Quincy.
"Q: Quincy?
"A: Jemison.
". . . .
"Q: At this time, you know, just tell me in your own words, you know, ... like this fellow, you know, what you remember. We were riding. We were walking. Whatever.
"A: This is how it was. We were riding. So we seen Big Amp across the street. Quincy turned and he say, `Hey, there's that fuck nigger Amp, man. Turn this car around. Turn this car around,' like that. So we went through an alley. They let us out about two blocks away from him. We ran down the alley. So Quincy was pointing the gun and he said, `Nigger, lay down, lay down.' Amp was laughing.
"Q: Amp was laughing at him?
"A: Yeah.
"Q: He didn't think he was serious?
"A: I guess not. So he laughed. Quincy said, `Nigger, lay down, lay down.' So he *1257 laid down. Quincy got his money and stuff out of his pocket, like that.
"Q: How much did he get?
"A: Six dollars. That's all he had, and a license.
"Q: A driver's license?
"A: Yeah. And he said ..., `Run, man; run, man; run,' like that. Said, `Go on back around to the car. Run.' So I'm running. I'm running and all I hear is two shots.
"Q: Then what happened?
"A: Dogs started barking. Then we got dropped over at Tooley's [Rodney Rice] auntie's house. And it wasn't mentioned no more that night."
(R. 361-63.) When asked why he was telling the police about this episode, Young responded:
"A: It's like this. It's this. I thought we was going to be homeboys, and everybody's trying to blame it on me. You know what I'm saying? We supposed to be in this together. If we did it, we did it. But it seems like all the fault is coming down on me and I didn't do nothing. I just was with them. You see what I'm saying. That's why I told."
(R. 374.)
Young then testified before the jury and changed his testimony about the events surrounding the shooting. He told the jury he was home babysitting his little brother and sister when Rodney Rice called him and invited him to a party. According to Young, Rice had gotten Leo Willis to drive Rice, Young, and Quincy Jemison the party. Along the way, Rice saw Anthony Williams and turned to Jemison and said, "What's up, Quincy?" According to Young, Jemison owed Rice some money and Rice was indicating he wanted Quincy to rob Williams. Quincy, in turn, agreed, and told Leo Willis to turn the car around. Then Young related:
"When Quincy got out of the car, I had got out of the car and urinated. So I hear Quincy saying, `Get down, get down,' like that. He told him, say, `Get down, nigger.' I hear somebody laughing.
"So I run down there to see what it was. By that time, when I got down there Anthony Williams was face down on the ground, right? Quincy was standing over him. So he turned around and seen me. He was, like, `Man, what are you doing down here? Run back to the car,' like this. So I just turned around and ran back to the car.
"By the time I gotit was like two alleys. By the time I got to the second alley, you can hear two gunshots. When Quincy cut across the yard, he was like right behind me, right? I thought somebody had shot at him. So he made it back to the car.
"So I asked Quincy, I said, `Man, what did you shoot him for?' Like that. [Quincy said,] `Man, he tried to reach for the gun. He tried to reach for the gun.' He was telling me, like that. So I said, `Man, you didn't have to shoot him.' You know what I'm saying?
"Rodney said, `Man, where the money is?' That's the first thing Rodney had said. He said, `Where's the money?'
"Q: That's Rodney Rice that said that?
"A: Yeah. When Quincy went in his pocket he had pulled out six dollars, right. He was counting it. So Rodney said, `You really big, Man.' Quincy said, `Man, it ain't nothing but six dollars. That's all I got,' like that. Then Rodney said, `Man, you can keep that, Man. You just still owe me.'
"So we went on to a gas station first, right? Then, so, when we got from the gas station we went on to the party. Then Rodney was like, `Man, we wasn't together that night, man. Y'all know we wasn't together,' like that. `If somebody comes asking, just tell them we wasn't together.' That's all I can remember at that time."
(R. 397-400.)
The prosecutor used Young's statement to police to vigorously cross-examine him. Sentence by sentence she pressed Young on which version of the events was the truth, which was a half-truth, and which was a lie. And time after time the prosecutor focused the jury's attention on Young's statement to the police that "I was a part of it."
Thus, when the jury deliberated, it had before it Rodney Rice's version of the story, in which Young was the instigator, the murderer, *1258 and the robber; Young's tape recorded statement to the police that, while he did not actually shoot Anthony Williams, he was a part of the robbery, and he was being blamed by the others because he was the youngest; and Young's testimony at trial that he was only along for a ride to a party when Rice and Jemison decided to rob Anthony Williams, and that he was just urinating in the street when Jemison killed Williams. From the jury's verdict finding Young guilty of felony murder, it is most likely that the jury gave considerable weight to Young's statement to the police.
Accordingly, we will not say that the error in admitting Young's statement into evidence at his trial was harmless beyond a reasonable doubt. Therefore, the judgment in this case is reversed, and the cause is remanded to the trial court for proceedings consistent with this opinion.
OPINION OF MAY 29, 1998, WITHDRAWN; OPINION SUBSTITUTED; RULE 39(k) MOTION DENIED; APPLICATION FOR REHEARING DENIED; REVERSED AND REMANDED.
LONG, P.J., and BASCHAB, J., concur.
BROWN, J., dissents with opinion in which McMILLAN, J., joins.
BROWN, Judge, dissenting.
I must respectfully dissent from the majority opinion reversing the appellant's felonymurder conviction based on the police officer's failure to advise Young of his rights under Rule 11(B), Ala.R.Juv.P., the "juvenile Miranda" rights.
The majority states: "The language of § 12-15-34.1 does not divest the child of the protections afforded by Rule 11(B) [Ala. R.Juv.P.], and it does not change the statutory definition of `child.' At an interrogation conducted before an arrest or formal charging, as was the case here, we will not place upon a police investigator the burden of deciding whether a child should be afforded the rights guaranteed them under Rule 11(B)." 730 So.2d at 1254. The majority's decision is based on our decision in Anderson v. State, 729 So.2d 900 (Ala.Cr.App.1998), in which we stated:
"We find nothing within the language of § 12-15-34.1, Ala.Code 1975, to support the state's contention that the rights granted to a child pursuant to Rule 11(B) are extinguished by the fact that a child who is alleged to have committed an offense enumerated in the statute `shall be charged, arrested, and tried as an adult' and automatically placed within the jurisdiction of the adult system. While § 12-15-34.1 clearly modifies the jurisdiction of the juvenile court and divests a child accused of committing a serious offense of the right to a transfer hearing in the juvenile court, see Price v. State, 683 So.2d 44 (Ala.Cr.App.1994[(1996)]), it does not modify the statutory definition of the term `child' and does not, by its terms, divest the child of the protections afforded by Rule 11(B). If the legislature, when enacting § 12-15-34.1, had intended to exclude from the statutory definition of `child' juveniles 16 years of age or older at the time of committing an offense enumerated in the statute, we may presume that it would have done so. It did not."
729 So.2d at 903-04.
Upon further examination of § 12-15-34.1, Code of Alabama 1975, I believe that the legislature's intent was to withdraw from persons falling within the purview of the statute all protections traditionally afforded to a "child." "It is a `well established principle of statutory interpretation that the law favors rational and sensible construction.'" King v. State, 674 So.2d 1381, 1383 (Ala.Cr. App.1995) (quoting 2A Norman J. Singer, Sutherland Statutory Construction § 45.12 (5th ed.1992)). Moreover, "[t]he courts will not ascribe to the legislature an intent to create an absurd or harsh consequence, and so an interpretation avoiding absurdity is always to be preferred.'" Daugherty v. Town of Silverhill, 672 So.2d 813, 816 (Ala. Cr.App.1995) (quoting 1A C. Sands, Sutherland Statutory Construction § 23.06 (4th ed.1972) (emphasis omitted)).
Section 12-15-34.1 provides, in pertinent part:
"(a) Notwithstanding any other provision of law, any person who has attained *1259 the age of 16 years at the time of the conduct charged, which if committed by an adult would constitute any of the following, shall not be subject to the jurisdiction of juvenile court but shall be charged, arrested, and tried as an adult:

"(1) A capital offense.
"(2) A Class A felony.
"(3) A felony which has as an element thereof the use of a deadly weapon.
"(4) A felony which has as an element thereof the causing of death or serious physical injury."
(Emphasis supplied.)
The language of the statute could not be clearer: anyone over 16 who commits any of the listed offenses is to be treated as an adult and shall be removed from the jurisdiction of the juvenile court. The language of the statute plainly excludes juveniles 16 and older from the definition of a "child" by stating that they are to be treated as adults. In my opinion, this Court's holding that the fact that the statute provides that the juvenile is to be treated as an adult does not mean that he was divested of the protections afforded by Rule 11(B), Ala.R.Juv.P., amounts to sophistry. That holding creates a new category of criminal defendant, one who is neither wholly a "child" nor entirely an "adult." Certainly, this could not have been what the legislature intended when it enacted § 12-15-34.1.
I believe this Court's reliance on the Alabama Supreme Court's decisions in Ex parte Jackson, 564 So.2d 891 (Ala.1990), and Ex parte Whisenant, 466 So.2d 1006 (Ala.1985), was misplaced. As the state correctly points out, both of those cases were decided before the enactment of § 12-15-34.1. At that time, the only method by which juvenile defendants could be tried as adults in circuit court was by way of a transfer hearing in the juvenile court, as provided in § 12-15-34. Because every juvenile defendant's case originated in juvenile court, Rule 11(B) was therefore applicable to the initial encounters between the juveniles and the law enforcement officers in Jackson and Whisenant.
By contrast, § 12-15-34.1 prevents an entire category of juvenile defendants from ever encountering the juvenile court system. Because none of the proceedings against the appellant took place in juvenile court, the Alabama Rules of Juvenile Procedure have no application. See Rule 1, Ala.R.Juv.P. ("These rules govern the procedure for all matters in the juvenile court.") This Court's original interpretation of § 12-15-34.1 was neither rational nor sensible.
There may be strong policy arguments in favor of the holding requiring that juveniles removed from the jurisdiction of the juvenile court pursuant to § 12-15-34.1 be advised of the rights enumerated in Rule 11(B), Ala. R.Juv.P. See Anderson v. State, 729 So.2d at 908. However, it is not the province of this Court to make policy. Our function is to interpret the law. Art. III, § 43, Alabama Constitution of 1901, states:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
"Courts, above all others, are charged with a very sacred duty not to encroach upon the domain of other departments of government under our constitutional system of government." Hendrix v. Creel, 292 Ala. 541, 545, 297 So.2d 364 (1974). As the Alabama Supreme Court stated in Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 911 (Ala. 1992):
"`No branch of the government is so responsible for the autonomy of the several governmental units and branches as the judiciary. Accordingly, we have held that courts cannot and will not interfere with the discretion vested in other units or branches of government.'"
Quoting Finch v. State, 271 Ala. 499, 503, 124 So.2d 825 (1960).
Although the majority's opinion purports to interpret § 12-15-34.1, it instead legislates, *1260 by choosing to overlook the express language of the statute. Courts lack the legislative authority to make policy decisions; that authority has been constitutionally assigned to the executive branch and the legislative branch. I believe that the opinion sets a dangerous precedent by disregarding the clear language of § 12-15-34.1, and replacing it with our own somewhat tortured interpretation.
Accordingly, I would affirm the appellant's conviction for felony murder. Therefore, I must dissent.
NOTES
[1] The pertinent portions of § 12-15-34.1, Ala. Code 1975, provide:

"(a) Notwithstanding any other provision of law, any person who has attained the age of 16 years at the time of the conduct charged, and who is charged with the commission of any act or conduct, which if committed by an adult would constitute any of the following, shall not be subject to the jurisdiction of juvenile court but shall be charged, arrested, and tried as an adult:
"(1) A capital offense.
"(2) A Class A felony.
"(3) A felony which has an element thereof the use of a deadly weapon.
"(4) A felony which has an element thereof the causing of death or serious physical injury."