Shaber Chamond Wimberly appeals from his conviction for five counts of capital murder, see §§ 13A-5-40(a)(2), (4), and (10). Wimberly was tried before a jury on the charges that he murdered Max King and his wife Johneen King during the commission *Page 569 
of a first-degree robbery and a first or second-degree burglary, and pursuant to a single scheme or course of conduct. Following a guilty verdict on all five counts, the jury, by a 10-2 vote, recommended that Wimberly be sentenced to death. On July 30, 1998, the trial court sentenced Shaber Chamond Wimberly to death. This appeal follows.
The trial court made the following findings of fact in its sentencing order:
 "On Sunday, January 26, 1997, during the evening hours, Max D. King and Johneen King were murdered at their home, located at Route 2, Box 4, Midland City, Alabama.
 "On Sunday, January 26, 1997, the Kings were at their home on Highway 134, between Midland City and Pinckard, Alabama. Their motor vehicles were parked in their driveway and in their garage or carport. Their lights were on. It was obvious to anyone that the Kings were at home and awake. Their dwelling was occupied.
 "[Wimberly] and another person approached the Kings' home and knocked on the door. [Wimberly] and the other person were under the guise that they were looking for a particular person or house. When Mr. King responded to the knock at the door, [Wimberly] and his associate or accomplice forced their way into the home. Mr. King was forced to lay down on the den floor in front of the television and was shot through the top of the head with a 9mm pistol. According to the autopsy reports and the testimony of Dr. Parades, the forensic medical examiner, the bullet entered the top of the head, passed through the brain, and exited the throat and neck area.
 "[Wimberly] and his associate or accomplice then escorted Mrs. King to the kitchen area in search of her purse and money, and shot Mrs. King in the top of the left side of the head.
 "Both Mr. and Mrs. King were shot with a 9mm pistol at close range one time into the head.
 "[Wimberly] and his accomplice or associate took or stole Mr. King's wallet, a .357 revolver, a [.30-30] rifle, Mrs. King's purse and contents, a toolbox, and a safe which contained several hundred dollars[s]. . . .
"[Wimberly] and his associate then fled the scene."
(R. 1284-85.) Neighbors discovered the Kings the next morning, lying dead where they had been gunned down, execution style. Six months later, another person living near Dothan, Alabama, was murdered and her store and home, which was in the back of the store, was burglarized; the killers used the identical modus operandi as that used in the King murders. Wimberly was seen by a police officer driving that victim's vehicle shortly after the murder, and he was ultimately arrested for that murder. While he was being held in custody for that murder, his fingerprints were taken. They were subsequently identified as matching those fingerprints found on the carport door of the Kings' house. Ballistics tests confirmed that the Kings and the Dothan victim were shot with the same handgun. Wimberly admitted to police investigators that he was present at the Dothan victim's house at the time of her murder, but he denied killing her.
 I.
Wimberly argues that the trial court erred by not suppressing Wimberly's statement to police investigators concerning the King murders. Wimberly, who was 17 years old at the time of the interrogation, was advised of, and waived, hisMiranda rights, but he was never advised of his juvenile Miranda
rights before his interrogation. At the time of his interrogation concerning the murders of Max and Johneen King, Wimberly was under arrest and in custody for the Dothan murder. *Page 570 
He was not under arrest for the murders of the Kings.
 A.
Rule 11(B), Ala.R.Juv.P., enumerates the rights of a child who is in custody but who has not yet been questioned. It provides as follows:
 "(B) Rights of the Child Before Being Questioned While in Custody. Before the child is questioned about anything concerning the charge on which the child was arrested, the person asking the questions must inform the child of the following rights:
"(1) That the child has the right to counsel;
 "(2) That if the child is unable to pay a lawyer and if the child's parents or guardian have not provided a lawyer, one can be provided;
 "(3) That the child is not required to say anything and that anything the child says may be used against the child;
 "(4) That if the child's counsel, parent, or guardian is not present, then the child has a right to communicate with them, and that, if necessary, reasonable means will be provided for the child to do so."
The State concedes that Wimberly was not advised of his "juvenile" rights set out in Rule 11(B), but it argues that, under these circumstances, adult Miranda warnings were sufficient and any error resulting from the failure to advise Wimberly of his juvenile rights was harmless.
We resolved this identical issue in Anderson v. State,729 So.2d 900 (Ala.Cr.App. 1998), and in Young v. State,730 So.2d 1251 (Ala.Cr.App. 1998). We held in Anderson
that there was "nothing in the language of § 12-15-34.1 [The statute that enumerates those charges for which juveniles shall be "charged, arrested, and tried as an adult."], to support the state's contention that the rights granted a child pursuant to Rule 11(B) are extinguished by the fact that a child alleged to have committed an offense enumerated in that statute `shall be charged, arrested, and tried as an adult' and automatically subjected in the jurisdiction of the adult system." The language of § 12-15-34.1 does not divest the child of the protections afforded by Rule 11(B), and it does not change the statutory definition of "child." Because § 12-15-34.1 does not state that a juvenile loses the right to be treated as a juvenile when an offense is alleged to have been committed, but only when he or she is charged with one of the offenses enumerated in § 12-15-34.1, to hold otherwise, as we noted in Young, would place upon police investigators at an interrogation the burden of deciding whether a child should be afforded the rights guaranteed by Rule 11(B) before any formal decision has been made as to whether the child will be arrested or charged with an offense for which he or she will be tried as an adult. We rely on our rationale in Anderson and Young in holding that Wimberly's custodial statement was improperly admitted in evidence because Wimberly was not informed that he had a right to communicate with his parent or guardian, as provided in Rule 11(B), Ala.R.Juv.P.
 B.
Having determined that the police investigator's failure to inform Wimberly of his juvenile Miranda rights was error, we must now determine whether the error in admitting Wimberly's statement into evidence was harmless. Coral v. State, 628 So.2d 954, 973
(Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012 (1994). The proper inquiry in determining whether the constitutional error in this case is harmless was set out by the United States Supreme Court in Chapman v. California, *Page 571 386 U.S. 18 (1967):
 "In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. . . .
 ". . . We prefer the approach of this Court in deciding what was harmless error in our recent case of Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171
[(1963)]. There we said: `The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' Id., at 86-87, 84 S.Ct. at 230. . . . Certainly error, constitutional error, in illegally admitted highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was not injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in Fahy v. State of Connecticut about `whether there is a reasonable possibility that the evidence complained of did not contribute to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard. . . ."
386 U.S. at 23-24.
"In order for the error to be deemed harmless under Rule 45, [Ala.R.App.P.], the state must establish that the error did not injuriously affect the appellant's substantial rights." Coral v.State, 628 So.2d at 973.
In this case, the jury had before it evidence of Wimberly's fingerprints on the Kings' carport door, ballistics evidence that the Kings were shot with the same weapon that was later used to kill another person during a burglary/robbery in Dothan, and that Wimberly admitted being at the scene of that Dothan murder. We note that, unlike the statement taken by investigators concerning the murders of the Kings, Wimberly was under arrest for the Dothan murder at the time he made his statement to investigators concerning that murder. Because he had already been arrested for an offense for which he would be treated as an adult, Wimberly no longer retained his juvenile Miranda rights as to the Dothan offense, and that statement was admissible, even though he was not advised of his juvenile rights. State v. Banks, 734 So.2d 371
(Ala.Cr.App. 1999).
Wimberly's statement concerning his presence at the scene of the murders of the Kings was introduced by way of an audiocassette and a statement in Wimberly's own handwriting. In his statement, Wimberly goes into great detail as to how he and his partner entered the Kings' home and how Max King and Johneen King were murdered and what Wimberly and his partner then took from the house. As in his statement to police concerning the Dothan murder, Wimberly portrayed himself as a passive onlooker to the events, not an active participant. Wimberly did not testify at trial, and was thus not subjected to cross-examination concerning his statement, but his statement was compared to his statement concerning the Dothan *Page 572 
murder, which was also introduced into evidence. The two statements, which not only placed Wimberly at the crime scenes, but also clearly put him inside the homes during the crimes and made him a participant in the robbery/murders, when combined with the ballistic report, made a strong circumstantial case against Wimberly. He and the weapon that was used to kill these people were the only common participants in the three robbery/murders.
The effect of Wimberly's descriptions of these murders, which showed him to be a participant in the robbery/murders, was so persuasive that, during closing arguments, defense counsel admitted that Wimberly was guilty of felony murder. It is most likely that the jury gave considerable weight to Wimberly's statement in determining that he either was the triggerman, or shared the same intent as the shooter and was therefore an abettor in the murders.
Accordingly, we cannot say that the error in admitting Wimberly's statement into evidence at his trial was harmless beyond a reasonable doubt. Therefore, the judgment in this case is reversed, and the cause is remanded for proceedings consistent with this opinion.
Because we must reverse on this issue, we will not discuss the other issues raised by Wimberly. However, because one issue may arise on any retrial of this case, we feel compelled to address it now.
 II.
In our review of this case for plain error, pursuant to Rule 45A, Ala.R.App.P., we note that the testimony of Cindy McClendon, the Kings' daughter, offered by the prosecution as victim impact testimony at the sentencing phase of the trial, goes far beyond the limits of permissible victim impact evidence.
In Booth v. Maryland, 482 U.S. 496 (1987), the United States Supreme Court vacated a death sentence, holding that it violated the defendant's Eighth Amendment rights for the sentencer to consider victim impact statements in sentencing the defendant to death. However, in 1991, the Supreme Court, in Payne v.Tennessee, 501 U.S. 808 (1991), overruled Booth to the extent that Payne held that a defendant's Eighth Amendment rights were not violated by the sentencer's consideration of statements regarding the victims and the impact of their deaths upon the family members. However, Payne did not overrule that portion ofBooth that proscribed consideration of the victim's family members' characterizations or opinions about the defendant, the crime, or their beliefs as to an appropriate punishment. The Alabama Supreme Court has held that a defendant's Eighth Amendment rights were violated if a sentencer considered those portions of a victim impact statement wherein "the victim's family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment." Ex parte McWilliams,640 So.2d 1015, 1017 (Ala. 1993).
In this case, after calling Cindy McClendon as a witness at the sentencing phase and identifying her as the daughter of Johneen King,[1] the prosecutor sought permission for Ms. McClendon to read a written statement to the jury. The Court gave its permission. (R. 1202.)
The written statement read by Ms. McClendon to the jury contained the following comments:
 "The man who sits before us in this Court is a predator, void of emotion, a murdering thief. His cruel behavior resulted in the unlawful and malicious killing of three caring and giving human beings. He violated the sanctity of our home, murdered our parents, stole their belongings, and boasted of his deed to others. *Page 573 
 "There is another word, perhaps, that best describes this convicted murderer, and that is coward. Wimberly did not stay at the scene shaking in horror and report his actions to the police. He chose to run like a coward, hiding his tracks. He did not admit shooting my parents, he did not stand before the Court and plead guilty. He hid behind a wall of lawyers standing up for his rights. And as he sits here today, he shows no remorse for his actions.
 "If this convicted murderer is given life in prison, he will have just that: life. He will live in a community; he will eat, sleep, and smoke at the expense of the State. He will watch television, work for spending money, and have visitors. He could even enter into matrimony. At the expense of the State, he could become a college graduate, a published author, or communicate with others through the internet.
 "In ten or fifteen years, the State, like many before it, will likely change its methods of execution. Unlike my parents, the convicted murderer will know when his time is coming and have a chance to seek forgiveness from God and, in all likelihood, be put to death while in a deep sleep. . . .
 "In closing, we recognize that you have a most difficult task. We understand that the decision you must make is not easy. You must decide when and where to stand up to this type of aggression. Imagine if it were your loved one. How would you feel and what you would ask for now?
 "We realize that no matter what your verdict, it will not bring our family back. But you can allow justice to be served. It is the desire of myself and my family that Wimberly be given the sentence that he has handed out: Give him death. Thank you for our plea."
(R. 1205-07.) Not only did this statement contain improper comments concerning the family member's characterization and opinion of the defendant and the crime, along with a strongly worded exhortation for the jury to return a death sentence, the statement also put before the jury improper comments on facts not in evidence, an improper plea for the jury to put themselves in the place of the victim's family, see Montgomery v. State,446 So.2d 697, 702 (Ala.Cr.App. 1983), an improper comment upon the probability or possibility of what might happen in the future concerning a particular sentence, Ex parte Rutledge, 482 So.2d 1262,1264-65 (Ala. 1984), an improper comment on Wimberly's exercise of his constitutional right to remain silent, Bailey v.State, 717 So.2d 3 (Ala.Cr.App. 1998), and an improper comment on Wimberly's exercise of his fundamental right to plead not guilty and to require the State to meet its burden of proof as evidence of a lack of remorse, State v. Johnson, 293 S.C. 321, 324,360 S.E.2d 317, 319 (S.C. 1987).
Because the defense counsel never objected to this statement, we review it under the plain error rule. Rule 45A, Ala.R.App.P. "Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings." United States v. Butler,792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933 (1986).
This court recognizes the emotional devastation and loss the family members of Max King and Johneen King have suffered. Nevertheless, reviewing the remarks made by the family member to the jury during the sentencing hearing, we find the cumulative effect of these improper comments to be plain error. Had the prosecutor made these same comments in argument, we would find them to be a textbook example of prosecutorial misconduct. The fact that the these same comments were read to the jury by a bereaved family member only magnifies the impact such comments surely had on the jury as it closed to deliberate on its sentence recommendation. *Page 574 
We find that these comments were calculated to incite an arbitrary response from the jury and that they should have been excluded.Barbour v. State, 673 So.2d 461, 469 (Ala.Cr.App. 1994). If we were not already reversing this case for a new trial, we would set aside the sentence and remand this case to the trial court for a new sentencing phase before the jury and a new sentencing hearing before the trial court based on the admission of improper victim impact evidence. Gillespie v. State,549 So.2d 640, 644 (Ala.Cr.App. 1989).
For the above-stated reasons, the convictions and sentence are reversed and the case is remanded to the trial court for a new trial.
REVERSED AND REMANDED.
McMillan and Fry, JJ., concur. Long, P.J., concurs in result with opinion in which Baschab, J., joins.
[1] Ms. McClendon was Max King's stepdaughter.