934 So.2d 411 (2005)
Shaber Chamond WIMBERLY
v.
STATE of Alabama.
CR-99-1241.
Court of Criminal Appeals of Alabama.
April 29, 2005.
Opinion on Return to Remand August 26, 2005.
Rehearing Denied October 21, 2005.
Certiorari Denied January 20, 2006.
*413 Michael Crespi, Dothan, for appellant.
*414 William H. Pryor, Jr. and Troy King, attys. gen.; Margaret Mary (Missy) Fullmer, deputy atty. gen.; and Michael B. Billingsley and Corey L. Maze, asst. attys. gen., for appellee.
Alabama Supreme Court 1050191.
McMILLAN, Presiding Judge.
The appellant, Shaber Chamond Wimberly, was convicted of two counts of capital murder for murdering Mary Spivey during the course of a robbery and a burglary. See §§ 13A-5-40(a)(2) and (a)(4), Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Wimberly be sentenced to death. The circuit court sentenced Wimberly to death.[1]
The State's evidence tended to show the following. On June 24, 1997, Ray Spivey discovered the body of his mother, Mary Spivey, lying on the floor of her house near Columbia. Spivey had been shot in the face. The autopsy revealed that Spivey died from a gunshot wound to her left eye that entered her brain and fractured her skull. The back door of Spivey's house had been pried open, the house ransacked, and numerous items taken from the house and from a convenience store operated by Spivey that was connected to her house. Spivey's green minivan was also taken and the cash register from the convenience store was missing.
In the early morning hours of June 24, 1997, Houston County Deputy Sheriff Jeff Carlisle saw a green minivan hit a curb and lose a hubcap. Carlisle followed the minivan to return the hubcap. When the minivan stopped, another car, a Chevrolet, also stopped. Wimberly was driving the minivan and Junior Pruitt was driving the Chevrolet. After he gave Wimberly the hubcap, he allowed them to leave.
Junior Pruitt testified that Wimberly had awakened him in the early morning on June 24, 1997, and asked him to follow him in his car so that he could return the minivan that he was driving to his aunt. He said that after the minivan was stopped by Deputy Carlisle and they were allowed to proceed, he and Wimberly drove their vehicles to a deserted area, and Wimberly poured gasoline on the minivan and set it on fire. Pruitt took Wimberly to an area adjacent to Spivey's store where Wimberly's vehicle was stuck in a ditch. He said that at the time Wimberly was carrying a large sum of money.
A.D. Dawsey testified that he saw Wimberly and Evester Tharp, Wimberly's codefendant, in a green minivan on the day of the murder. He said that he saw Tharp burning bags and checks. Dawsey said that Wimberly telephoned him later in the day and told him to go to Wimberly's house and get Wimberly's sister. Dawsey said that Wimberly's sister retrieved a pistol from the attic and gave it to him to dispose of. He said that he buried the pistol in a ditch. The gun was never recovered, but a box of 9 mm ammunition was seized from Wimberly's bedroom.
Johnny Frank Coleman testified that he had seen Wimberly with a silver-plated 9 mm pistol on the day of the murder. He said that Wimberly was with Tharp and that he loaned them his car and when they returned it it was covered in mud.
Houston County Deputy Sheriff Sgt. Gary Lindsey testified that on the morning of June 24, 1997, he was dispatched to an area near Spivey's house where he discovered a green minivan that was registered to Spivey. The van had been burned.
*415 To prove Wimberly's intent to kill Mary Spivey, the State introduced evidence that Wimberly had been charged in a double homicide in Dale County. Evidence was presented that Calvin Butler, his codefendant in the Dale County murders, and Wimberly went to Max and Johneen King's house in Midland on January 26, 1997, and that Wimberly was carrying a 9 mm chrome pistol. Butler[2] testified that Wimberly shot the Kings in the head at close range.[3]
Forensic tests showed that the same gun was used to kill both Spivey and the Kings. Fingerprints recovered from the Kings' home matched Wimberly's fingerprints.
In his defense, Wimberly offered an expert who testified by videotaped deposition that in his opinion the bullet fragments taken from Spivey's body were not large enough to make any comparative analysis. This testimony conflicted with the State's expert's testimony. Wimberly also recalled Dawsey to the stand so that he could reiterate that he had seen Tharp burning bags and checks on the day of Spivey's murder.
The jury convicted Wimberly on two counts of capital murder for murdering Spivey during the course of a robbery and during the course of a burglary. A separate sentencing hearing was held before the jury. See § 13A-5-46, Ala.Code 1975. At the hearing Wimberly presented evidence that he was raised in an abusive household, that his natural father had abandoned him, that his stepfather and his mother were frequently drunk, that his stepfather was physically abusive, and that he and his brother had been taken from their home by the Department of Human Resources and were placed in a state facility for children with discipline problems. Dr. Doug McKeowan, a clinical psychologist, testified that Wimberly had trouble with authority figures, had borderline intellectual functioning, was depressed, and had symptoms consistent with an antisocial personality. The State in rebuttal presented the testimony of a forensic psychologist, who testified that Wimberly was able to distinguish right from wrong and that it was his opinion that Wimberly manufactured some of his symptoms.
The jury, by a vote of 10 to 2, recommended that Wimberly be sentenced to death. The circuit court sentenced Wimberly to death. The circuit court then directed that a presentence report be completed on Wimberly. See § 13A-5-47(b), Ala Code 1975. After a separate hearing before the circuit court, § 13A-5-47(c), the court sentenced Wimberly to death. Wimberly's appeal, which is automatic in a case where the defendant has been sentenced to death, followed. See § 13A-5-53(a), Ala.Code 1975.

Roper v. Simmons
The record shows that Wimberly was born on September 6, 1979, and that he murdered Mary Spivey on June 24, 1997. Wimberly was 17 years old when he committed the murder. The United States Supreme Court recently in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), held that it was a violation *416 of the Eighth and Fourteenth Amendments to impose a death sentence on an offender who was under the age of 18 at the time the crime was committed. This case abrogated its earlier decision in Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), upholding death sentences for offenders who were over the age of 16 at the time the crime was committed.
Wimberly's case was pending on direct appeal when the decision in Roper v. Simmons was released; therefore, the holding applies to him. "[A]ll defendants whose cases were still pending on direct appeal at the time of the law-changing decision should be entitled to invoke the new rule." United States v. Johnson, 457 U.S. 537, 545 and n. 9, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). See also Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). The Roper v. Simmons decision also applies retroactively to cases on collateral review because it places "`certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" Duncan v. State, 925 So.2d 245, 251 (Ala. Crim.App.2005), quoting Clemons v. State, [Ms. CR-01-1355, August 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003), quoting in turn other cases.
Because Wimberly was 17 years old when he committed the murder his sentence of death is due to be set aside. This case must be remanded for the Houston Circuit Court to set aside Wimberly's sentence and to resentence him to life imprisonment without the possibility the parolethe only other sentence available for a defendant convicted of capital murder. See § 13A-5-45(a), Ala.Code 1975.
Wimberly raises several arguments concerning the penalty phase of his capital trial. However, because Wimberly's death sentence is due to be set aside based on Roper v. Simmons, any questions concerning the penalty phase are moot and will not be discussed in this opinion. See Duncan.

I.
Wimberly argues that one of his attorneys Richard Ramsey had a fatal conflict of interest because he had previously represented Calvin Butlera State's witness and Wimberly's codefendant in the Dale County murders. He asserts in his brief to this Court, "The appellant urges the court to find that the cited conflict deprived him of the right to counsel and to due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Section 6 of the Alabama Constitution of 1901." (Wimberly's brief at 31.)
In Wimberly's motion for a new trial he argued that he was entitled to a new trial because Ramsey had previously represented Calvin Butler on an unrelated drug-possession charge to which Butler pleaded guilty. He argued that Ramsey did not disclose this conflict to Wimberly and that his failure to do so deprived Wimberly of his constitutional right to counsel.
Wimberly urges this Court to adopt a "per se" rule that prohibits the joint representation of both a prosecution witness and a defendant. However, Alabama has never adopted such a rule. As we stated in Molton v. State, 651 So.2d 663 (Ala.Crim. App.1994):
"It is `a basic constitutional precept' that those prosecuted for criminal offenses have a right to the assistance of counsel during the proceedings. Pinkerton v. State, 395 So.2d 1080, 1085 (Ala. Cr.App.1980), cert. denied, 395 So.2d 1090 (Ala.1981). `Where a constitutional right to counsel exists, [the United States Supreme Court's] Sixth Amendment *417 cases hold that there is a correlative right to representation that is free from conflicts of interest.' Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). `[T]he importance of ensuring that defense counsel is not subject to any conflict of interest which might dilute loyalty to the accused has been long and consistently recognized.' Douglas v. United States, 488 A.2d 121, 136 (D.C.App.1985). More than 45 years ago, the United States Supreme Court declared: `The right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client.' Von Moltke v. Gillies, 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948) (emphasis added). The right to conflict-free counsel applies whether counsel is appointed or retained. See Cuyler v. Sullivan, 446 U.S. 335, 343-45, 100 S.Ct. 1708, 1715-16, 64 L.Ed.2d 333 (1980).
"Just as there is no per se constitutional violation in `[r]equiring or permitting a single attorney to represent codefendants,' Holloway v. Arkansas, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978), `there is no per se rule prohibiting representation of the defendant by counsel who has previously represented a government witness,' United States v. Bowie, 892 F.2d 1494, 1502 (10th Cir.1990). However, where counsel who has previously represented a prosecution witness subsequently represents the defendant against whom the witness is to testify, the potential for a conflict of interests exists in `that defense counsel may not be able to effectively cross-examine the witness for fear of divulging privileged information.' Id. at 1501. This same concern, as well as other rather obvious concerns, arises when counsel simultaneously represents the defendant and a prosecution witness. See, e.g., Rosenwald v. United States, 898 F.2d 585, 587-88 (7th Cir.1990); Pinkerton v. State, 395 So.2d at 1086; People v. Wandell, 75 N.Y.2d 951, 555 N.Y.S.2d 686, 686-87, 554 N.E.2d 1274, 1274-75 (1990). Whether counsel's representation of the witness occurs before or is simultaneous with the representation of the defendant, the `potential for conflict is great where there is a substantial relationship' between the two cases. United States v. Bowie, 892 F.2d at 1502.
"The appellant did not raise the matter of a conflict of interest on the part of his trial counsel until well after the trial. Consequently, `[i]n order to establish a violation of the Sixth Amendment, . . . [he] must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' Cuyler v. Sullivan, 446 U.S. at 348, 100 S.Ct. at 1718. Accord Williams v. State, 574 So.2d 876, 878 (Ala.Cr.App.1990). To prove that an actual conflict adversely affected his counsel's performance, a defendant must make a factual showing `that his counsel actively represented conflicting interests,' Cuyler v. Sullivan, 446 U.S. at 350, 100 S.Ct. at 1719, `"and must demonstrate that the attorney `made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.'"' Barham v. United States, 724 F.2d 1529, 1532 (11th Cir.) (quoting United States v. Mers, 701 F.2d 1321, 1328 (11th Cir. 1983)), cert. denied, 467 U.S. 1230, 104 S.Ct. 2687, 81 L.Ed.2d 882 (1984). Once a defendant makes a sufficient showing of an actual conflict that adversely affected counsel's performance, prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)i.e., `that, but for counsel's unprofessional *418 errors, the result of the proceeding would have been different' is presumed. Strickland, 466 U.S. at 694, 692, 104 S.Ct. at 2068, 2067. See United States v. Winkle, 722 F.2d 605, 610 (10th Cir.1983); Williams v. State, 574 So.2d at 878."
651 So.2d at 668-69.
By far, the majority of states that have addressed this issue have likewise held that there is no per se ban on the joint representation of both a state witness and a defendant. See Holmes v. State, 754 So.2d 529, 534 (Miss.Ct.App.1999) ("Joint representation of co-defendants does not result in a per se violation of the right to counsel."); Curry v. State, 238 Ga.App. 511, 518, 519 S.E.2d 269, 276 (1999) ("`Single representation of multiple defendants raises no per se presumption of conflict of interest or prejudice.'"); Newby v. State, 967 P.2d 1008, 1014 (Alaska Ct.App.1998) ("We decline to find that reversal automatically follows upon a bare showing of conflict of interest."); State v. Robinson, 79 Wash.App. 386, 394, 902 P.2d 652, 656 (1995) ("Joint representation is not a per se violation of the right to effective assistance of counsel."); Burnside v. State, 656 So.2d 241, 243 (Fla.Dist.Ct.App.1995) ("Conflict of interest cases warrant a similar, though more limited, presumption of prejudice. Although it is a `fairly rigid rule of presumed prejudice,' it is `not quite the per se rule of prejudice' that is applicable in denial of counsel cases."); Sanborn v. Commonwealth, 892 S.W.2d 542, 548 (Ky.1994), cert. denied, 516 U.S. 854, 116 S.Ct. 154, 133 L.Ed.2d 98 (1995) ("[T]he appellant seems to argue that prejudice to him must be presumed by the Court since he insists there was a per se conflict. We decline to indulge in any such presumption of prejudice."); State v. Guzman, 126 Idaho 368, 371, 883 P.2d 726, 729 (1994) ("Joint or multiple representation is not a per se violation of [the right to have counsel free of any conflict of interest]."); Allen v. State, 874 P.2d 60, 63 (Okla.Crim. App.1994) ("The Supreme Court noted in Strickland that while prejudice is presumed in certain Sixth Amendment contexts, there is not a per se rule of prejudice for conflicts of interest."); State v. Montegut, 618 So.2d 883, 888 (La.Ct.App. 1993), cert. denied, 626 So.2d 1177 (La. 1993) ("Joint representation of multiple defendants is not a per se violation of a defendant's right to effective assistance of counsel. It rises to that level only if the defendant proves an actual conflict of interest."); Wilson v. State, 525 N.E.2d 619, 621 (Ind.Ct.App.1988) ("We have never held that the possibility of prejudice that `inheres in almost every instance of multiple representation' justifies the adoption of an inflexible rule that would presume prejudice in all such cases."); In re J.P.B., 419 N.W.2d 387, 390 (Iowa 1988) ("Where the alleged ineffectiveness of counsel derives from a conflict of interest, prejudice is presumed. . . . Even so, a per se rule is not applied."); Commonwealth v. Habicht, (No. 77-3186-93, January 23, 2001) (Mass.Super.Ct.2001) (unpublished) ("[W]hen a defendant can show no more than a potential conflict, the defendant must also show that the conflict resulted in actual prejudice."). Compare People v. Washington, 111 Ill.App.3d 711, 714, 67 Ill.Dec. 517, 519, 444 N.E.2d 753, 755 (1982), aff'd, 101 Ill.2d 104, 77 Ill.Dec. 770, 461 N.E.2d 393 (1984) ("The Illinois Supreme Court has fashioned a per se rule under which prejudice is presumed and reversal is mandated where defense counsel is shown to have had conflicting professional commitments.").
The circuit court held a hearing on Wimberly's motion for a new trial, at which time both of Wimberly's attorneys, Richard Ramsey and Gary Hudgens, were called to the stand. At the end of the *419 hearing the circuit court found that both attorneys had testified that the fact that Ramsey had previously represented Butler in an unrelated case did not affect the outcome of Wimberly's trial because they had obtained no information from Ramsey's prior representation of Butler. The circuit court also noted that the attorneys vigorously objected to the introduction of Butler's testimony and that they thoroughly cross-examined Butler.
The United States Court of Appeals for the Eleventh Circuit in Freund v. Butterworth, 165 F.3d 839, 859 (11th Cir.), cert. denied, 528 U.S. 817, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999), stated what is necessary to prove "actual prejudice" resulting from an attorney's conflict:
"In order to prove that an `actual conflict' hindered petitioner's lawyer's performance, petitioner `must make a factual showing of inconsistent interests' or point to `specific instances in the record' to suggest an actual impairment of his or her interests. Smith [v. White], 815 F.2d [1401] at 1404 [(11th Cir.1987)], Oliver v. Wainwright, 782 F.2d 1521, 1524-25 (11th Cir.) (emphasis and internal quotation marks omitted), cert. denied, 479 U.S. 914, 107 S.Ct. 313, 93 L.Ed.2d 287 (1986). `[G]enerally, it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so.' Smith, 815 F.2d at 1405. At minimum, petitioner must `show that either (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of [petitioner], or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to [petitioner's] later case.' Smith, 815 F.2d at 1405 (emphasis added)."
(Footnote omitted.)
Here, Wimberly did not raise this matter until after trial and did not attempt to show any "actual prejudice" caused by the alleged conflict and, indeed, we can find none in the record. Wimberly was not deprived of his right to counsel because his attorney did not have an actual conflict of interest.

II.
Wimberly argues in one paragraph of his brief that the circuit court erred in denying his motion challenging the nonrepresentation of black males as grand jury forepersons in Houston County.
The record shows that Wimberly filed a motion to dismiss the indictment based on Houston County's alleged discrimination in its selection of grand-jury forepersons. The circuit court held a hearing on this motion, at which the following occurred:
"The Court: Now, discrimination of selection of a grand jury foreperson will result in the dismissal of an indictment. However, you carry the burden to prove that. Do you have any evidence that you want to introduce in that regard? "[Defense counsel]: No, sir."
(R. 21.)
At the hearing the State called the circuit clerk of Houston Circuit, Judy Byrd, to testify. She said that the process of selecting a grand-jury foreperson has changed in Houston County within the last five years. She said that currently 65 people are summoned for jury service by randomly selecting their names from driver's licenses issued to the residents of Houston County. All 65 names are then placed in a hat. To select the grand jury, 18 names are picked from the hat. To select the grand-jury foreperson, the 18 *420 names are placed in the hat and 1 name is drawn from the 18. Byrd said that after the method of selecting grand-jury foreperson had changed blacks had been selected as grand-jury forepersons.
"`"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
"`Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).'
"Pierce v. State, 576 So.2d 236, 241 (Ala. Crim.App.1990), opinion on return to remand, 612 So.2d 514 (Ala.Crim.App.), aff'd, 612 So.2d 516 (Ala.1992). Also, the appellant has the burden of establishing a prima facie case of a "fair cross section" violation. See Rayburn v. State, 495 So.2d 733 (Ala.Crim.App.1986).
"The appellant has not satisfied his burden as to this contention. First, he has not established that blacks or Hispanics were distinctive groups in Escambia County. Second, he has not established that the representation of these groups in the grand jury lists is not fair and reasonable in relation to their population in the community. Third, he has not established that this underrepresentation is due to systematic exclusion of the groups in the grand jury selection process. Therefore, the appellant has not satisfied his burden of proof as to this argument, and we do not find any error in this regard."
Peraita v. State, 897 So.2d 1161, 1212-1213 (Ala.Crim.App.2003).
First, Wimberly has not satisfied his burden of establishing a prima facie violation of the fair-cross-section requirement. Nor has he shown that the method of selecting grand jury forepersons in Houston County results in the systematic exclusion of black jurors. Wimberly simply failed to meet his burden.
Moreover, we have held that Houston County's new method of selecting grand-jury forepersons is race neutral. See Harris v. State, 683 So.2d 26, 31 (Ala.Crim. App.1996) ("Mrs. Byrd testified that under the new procedure all the grand jury member's names are placed in a hat and the judge selects one name. . . . This selection method is race neutral. . . ."). The circuit court committed no error in denying Wimberly's motion to dismiss the indictment.

III.
Wimberly argues that the circuit court abused its discretion in denying his motion for a change of venue. Spivey was murdered in June 1997. Wimberly was tried in January 2000, about two and one-half years after the murder.
The circuit court, in reserving ruling on the motion until after voir dire examination, made the following findings:
"A review of the voluminous exhibits introduced in support of [Wimberly's] Motion to Change Venue reveals twice as much publicity concerning the King cases[4] as was produced concerning the Spivey case. These exhibits further reveal that most media attention occurred for several days during the King investigation, several days during the Spivey *421 investigation which also included alleged connections with the King cases, during various court appearances, during the King trials and ultimate reversal of the King convictions. The King trials occurred during April 1998. There of course has been no trial in the Spivey case by agreement of the parties and the Court to await a ruling from the Court of Criminal Appeals on the King cases. The delay has possibly had the effect of allowing publicity to subside and memories to fade.
"[Wimberly] also introduced voluminous material regarding the murders of two Dothan teenagers in Ozark and the arrest of Barrentine[5] for their deaths. In fact, WDHN news director Andrea Boutwell testified that there was far greater coverage for the Barrentine case. The Court finds any coverage concerning the Barrentine case as totally irrelevant to the present case, as Defendant Wimberly is not charged or even mentioned in connection with the Barrentine case. Attorneys can broach this issue during voir dire, if necessary.
"The right to a fair and impartial jury is guaranteed by the Sixth Amendment to the United States Constitution which states: `In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . .' This right is also preserved in Article I, Section 6 [of] the Alabama Constitution of 1901. However, [Wimberly] has failed to meet his burden in affirmatively showing that pretrial publicity so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between the publicity generated and the existence of actual juror prejudice. This is not to say that there may not be actual prejudice as determined during trial voir dire. Insofar as this is a capital murder case and ever mindful of it [sic] duty to ensure a fair and impartial trial, the Court will reserve jurisdiction of this matter to such time as a jury venire can be impaneled and a determination be made as to whether or not actual prejudice exists."
(C.R. 484-85.)
"`Rule 10.1(a), Ala. R.Crim. P., states, "[T]he defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and unbiased verdict cannot be had for any reason." The burden of proof is on the defendant "to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried." Rule 10.1(b). . . .
" `. . . .
"`" The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge, because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.' Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr.App.1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App.1984)."
"`Burton v. State, 651 So.2d 641 (Ala. Cr.App.1993). The trial court's ruling on a motion for a change of venue will *422 not be reversed absent an abuse of discretion. Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993); Mullis v. State, 545 So.2d 205, 209 (Ala.Cr.App. 1989); Knighten v. State, 507 So.2d 1015, 1021 (Ala.Cr.App.1986). To meet the burden of proof necessary to require a change in venue because of pretrial publicity, the defendant must show more than that the case generated widespread publicity. Oryang v. State, 642 So.2d 979 (Ala.Cr.App. 1993). . . . "`It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" Ex parte Fowler, 574 So.2d 745, 747 (Ala. 1990) (quoting Nelson at 1131); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).'
"Buskey v. State, 650 So.2d 605, 609-10 (Ala.Cr.App.1994). The trial judge questioned the veniremembers regarding their knowledge of the facts of this case. The lack of response he received when he asked which members of the venire were familiar with the case supports his denial of the motion for a change of venue."
Ex parte Windsor, 683 So.2d 1042, 1046 (Ala.1996).
The record shows that 75 prospective jurors were questioned during voir dire examination. Our review of the record shows that 35 of those prospective jurors indicated that they had heard or read something about the case. Each of those 35 jurors was questioned individually. Five jurors indicated that their prior knowledge of the case would prejudice them in serving on the jury. Those five jurors were all removed for cause on joint motion of the parties. Two jurors were struck for cause because they indicated that they had heard that Wimberly had been convicted of the murders in Dale County.[6] Four jurors were struck because they indicated that they could not vote for the death penalty under any circumstances. One juror was struck because she said that she would require the State to prove its case by more than a reasonable doubt before she could vote to convict. One juror was struck because he said that race would be a factor in his decision. All of the remaining jurors who indicated that they had heard or read about the case said that they could be impartial and that any prior knowledge that they had about the case would not affect their ability to render an impartial decision. After voir dire examination defense counsel indicated that it had a continuing objection related to its motion for a change of venue. The following occurred:
"The Court: I told you that I would give you an opportunity to address it at the appropriate time. This is the appropriate time and you must show to the Court actual prejudice.
"[Defense counsel]: The actual prejudice, Judge, would be the approximate number of people that have indicated that they have read the [Dothan] Eagle, [a local newspaper] listened to the T.V., which are indicated in the questionnaires and the originals are withnot admitted, but the Court has the originals. I would ask that that be considered an exhibit to, my original motion for change of venue."
(R. 903-04.)
Wimberly's only argument was that he was prejudiced because of the number of prospective jurors who indicated that they *423 had heard about the case. This fact alone is not sufficient to warrant a change of venue. As we stated in Siebert v. State, 562 So.2d 586, 589-90 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990):
"`[T]he fact that even a majority of the prospective jurors had preconceived notions of the guilt of the accused does not require a change of venue where there is evidence that the jurors would be able to lay aside their impressions or opinions and render a verdict based on the evidence presented in court. Callahan v. State, 471 So.2d 447, 452 (Ala.Cr.App.1983), reversed on other grounds, Ex parte Callahan, 471 So.2d 463 (Ala.1985). "The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).
"`The trial court's findings of impartiality should be overturned only for "manifest error." Irvin v. Dowd, 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).'
"Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988). We also find no evidence of an inherently prejudicial climate that would prevent the appellant from receiving a fair and impartial trial. Robinson v. State, 430 So.2d 883 (Ala. Cr.App.1983).
"Furthermore, while the evidence of press coverage submitted by the appellant contained only factual reports of the progress of the investigation and the announcement of the upcoming trial, the majority of the articles were released between the time of the crime in February 1986 and the appellant's arrest in September 1986. The trial did not begin until March 1987. `"[T]he passage of time cannot be ignored as a factor in bringing objectivity to trial."' Whisenhant v. State, 555 So.2d 219 (Ala.Cr.App. 1988), quoting Dannelly v. State, 47 Ala. App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971). See also Murphy v. Florida, 421 U.S. 794, 802, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975)."
The voir dire examination clearly shows that none of the jurors who served on the jury were prejudiced against Wimberly as a result of publicity about the murder. Almost every juror who answered that he or she had heard about the case could not remember any specific details surrounding what he or she had read. The few that did remember were questioned and indicated that they could be impartial. Moreover, the murder was committed more than two years before Wimberly's trial. The record shows no indication of an "inherently prejudicial climate" in Houston County. The circuit court did not abuse its discretion in denying Wimberly's motion for a change of venue.

IV.
Wimberly argues that the circuit court abused its discretion in denying his motion for a continuance so that he could secure the presence at his trial of a ballistics expert, David Keen. At Wimberly's trial for the Dale County murders, Keen testified that he was unable to conclusively state that the bullets recovered in those murders were fired from the same gun used in the murder of Spivey in Houston County. He testified that it was his opinion that the fragments were insufficient to permit a conclusion.
The record shows that three days before Wimberly's trial was scheduled to begin in *424 Houston County, Wimberly filed a motion for a continuance. A hearing was held on the motion. Wimberly stated at the hearing that he could not secure the presence of Keen for trial because Keen was a reserve police officer and he was on reserve duty on the dates the trial was scheduled. Keen had indicated a date he was free to appear in court. A lengthy discussion ensued, and the circuit court indicated its displeasure in having to continue the case again when two and one-half years had already passed since the murder. The circuit court gave Wimberly the option of either admitting the sworn testimony of Keen from the Dale County trial or obtaining a new expert. It does not appear that there was any other discussion of this issue. After the State rested, the defense called Keen by way of deposition. The circuit court then gave the following instruction to the jury:
"Let me say this, Ladies and Gentlemen of the jury. The defense is introducing evidence by way of deposition. A deposition is sworn testimony that occurs at a previous time and is memorialized in writing. That is sworn testimony with the parties present, each side will have a right to ask questions. It is evidence, just like a witness who appears live in front of you. And, it is to be considered by you as evidence along with all of the other evidence that you hear in this case and should be given whatever weight and credit you deem it entitled to as you would any other piece of evidence that comes before you in this case. But, I just want you to understand that Mr. Keen is not here. It is, nonetheless, sworn testimony and would be evidence in this case as a witness who appears live in front of you."
Keen's sworn testimony was admitted into evidence. Wimberly did not object to the circuit court's resolution of this issue.
As we have stated:
"The general rule established to review such motions for continuance has been expressed as follows:
"`A movant must show that due diligence has been exercised to obtain the attendance of the witness, that substantial favorable testimony would be tendered by the witness, that the witness is available and willing to testify, and that the denial of a continuance would materially prejudice the defendant.' United States v. Miller, 513 F.2d 791, 793 (5th Cir.1975). See also United States v. Cawley, 481 F.2d 702, 705 (5th Cir.1973). See also Smith v. State, 368 So.2d 298 (Ala.Crim.App. 1978), pp. 303, 304, writ quashed, 368 So.2d 305 (Ala.1979).
"A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there has been an abuse of that discretion. United States v. Uptain, 531 F.2d 1281 (5th Cir.1976)."
Whitehead v. State, 429 So.2d 641, 644 (Ala.Crim.App.1983).
"`Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burdens counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances.'"
Price v. State, 725 So.2d 1003, 1061 (Ala. Crim.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), quoting Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).
*425 We do not believe that Wimberly suffered any prejudice as a result of the circuit court's failure to grant a continuance. The testimony he sought to introduce was admitted by way of deposition; the circuit court instructed the jury that this evidence was as strong as evidence from the witness stand. Also, the ballistic evidence linking Wimberly to the Dale County murders was not the strongest evidence presented of Wimberly's participation in those murders. Wimberly's codefendant in the Dale County murders testified that Wimberly shot both of the Kings, and Wimberly's fingerprints were also found at their house.
Based on the facts presented in this case we hold that the circuit court did not err in denying Wimberly's motion for a continuance.

V.
Wimberly argues that the circuit court erred in denying his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. He challenges the State's removal of only one prospective jurorW.H.
The prosecutor stated that it struck W.H. because, he said, W.H. did not follow the circuit court's instructions, i.e., he failed to stand and answer that he was present when the clerk called the roll. The prosecutor also struck three white prospective jurors for this same reason, and he gave the circuit court their names. The State also said that W.H. was struck because he could not read or write and he failed to complete the juror questionnaire.
The reasons advanced by the State were race neutral and did not violate Batson. As we stated in Acklin v. State, 790 So.2d 975, 988-89 (Ala.Crim.App.2000):
"Earlier in the voir dire, in a discussion as to whether C.H. was qualified to be a juror, all the parties came to the conclusion that C.H. was unable to read or write. The trial judge overruled the prosecution's challenge for cause, but, after discussing with the parties what written evidence might be introduced during the trial, the trial judge found the reason for the peremptory strike to be race-neutral. (R. 348-52.) Section 12-16-60(a)(2), Ala.Code 1975, requires that a juror be able to `read . . . instructions given by a judge in the English language.' This court has found illiteracy to be a race-neutral reason for a peremptory strike and has upheld a prosecutor's peremptory strike based on that reason. See Wright v. State, 601 So.2d 1095 (Ala.Crim.App.1991); Williams v. State, 548 So.2d 501 (Ala. Crim.App.1988).
"The standard for reviewing a trial judge's decision on a Batson issue gives great deference to the trial judge's decision. Hall v. State, [820 So.2d 113 (Ala. Crim.App.1999)].
"`"The trial court's ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31 (Ala.Crim.App.1992); Jackson v. State, 594 So.2d 1289, 1294 (Ala.Crim.App.1991). `It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed on review unless it is "clearly erroneous."' Ex parte Bankhead, 625 So.2d 1146 (Ala.1993)."'
"Farrior v. State, 728 So.2d 691, 698 (Ala.Crim.App.1998), quoting Merriweather v. State, 629 So.2d 77, 88 (Ala. Crim.App.1993). We cannot say, after a careful review of the record, that the race-neutral reasons advanced by the prosecutor for the peremptory strikes were a sham, nor is there any evidence of disparate treatment between prospective *426 African-American jurors and prospective white jurors."
The circuit court did not err in denying Wimberly's Batson motion.

VI.
Wimberly argues in one paragraph in his brief to this Court that the circuit court erred in admitting evidence of the Dale County murders. He argues that it was more prejudicial than probative and that it was irrelevant.
The record shows that before trial the State filed a notice of its intent to use Rule 404(b), Ala.R.Evid., evidence by introducing evidence related to the Dale County murders. (C.R. 234.) The defense filed a motion in limine seeking to exclude this evidence. Wimberly also made numerous objections to this evidence during trial. A lengthy hearing was held on this motion. The circuit court initially ruled that it would allow evidence of the Dale County murders but that it would not allow the State to retry that case. The circuit court specifically disallowed photographs of the victims of the Dale County murders. The court did allow testimony from Calvin Butler, Wimberly's codefendant in the Dale County murders; fingerprint evidence taken from the Dale County murders; and forensic evidence concerning the gun used to kill the Kings.
Rule 404(b), Ala.R.Evid., states:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . ."
As stated in Charles W. Gamble, McElroy's Alabama Evidence, § 69.01(5) (5th ed.1996):
"If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that, because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. Whether the collateral act has a tendency to show that the accused did possess the prerequisite state of mind is, of course, one of relevancy vested largely in the discretion of the trial court.
"It is important to note that intent may not be asserted, as a successful way to circumvent the general exclusionary rule of character, unless intent is material or of consequence to the case. This normally means that it must be an element of the crime with which the accused is charged. However, such materiality could arise in other ways, such as by the defendant's express denial of intent. In whatever way that it might become of consequence in the case, the courts have made it clear that intent must be a genuine issue before it may be used as a channel through which to admit collateral conduct of the accused."
(Footnote omitted.)
Applying this exception to the general exclusionary rule in Gamble v. State, 791 So.2d 409 (Ala.Crim.App.2000), this Court stated:
"In Bradley v. State, 577 So.2d 541 (Ala.Cr.App.1990), this court stated:
"`We have recognized that the list of traditionally recognized exceptions is *427 not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)]. "It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character." C. Gamble, McElroy's Alabama Evidence § 69.0[1](1) (3d ed.1977) (quoting Mr. Justice McElroy, 2nd ed.)
"`"In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it."
"`Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if "it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury," Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App. 1985), or put another way, "unless its probative value is `substantially outweighed by its undue prejudice,'" United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472(1979)).
"`. . . .
"`Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was "material and logically relevant" to an issue or issues in the case.'
"577 So.2d at 547-48. `If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime.' Bush v. State, 695 So.2d 70, 85 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
"We find that, in this case, the evidence of the collateral crimes was material and logically relevant to show Gamble's intent and knowledge in committing the charged crime. `"If an accused is charged with a crime that requires a prerequisite intent, . . . then prior or subsequent criminal acts are admissible to establish that he had the necessary intent when he committed the instant crime."' Hinton v. State, 632 So.2d 1345, 1348 (Ala.Cr.App.1993), quoting Jones v. State, 439 So.2d 1308, 1310 (Ala.Cr.App.1983) (emphasis in Hinton omitted). In addition:
"`Evidence of the accused's commission of another crime or act is admissible if knowledge of a certain fact (which usually means the accused's reason to believe the existence of such fact in consequence of things seen or information received) is an element of the now-charged crime and the accused's commission of such other *428 crime or act is relevant to show such knowledge. Many decisions speak of this particular purpose as synonymous with intent.'
"C. Gamble, McElroy's Alabama Evidence, § 69.01(4) at 314 (5th ed.1996) (footnotes omitted).
"To prove the capital-murder charge, the State, proceeding under an accomplice-liability theory, was required to show that Gamble intentionally murdered Burleson and Littleton during a robbery in the first degree. Gamble's theory of the case was that although he intended to commit a robbery at the pawnshop, he never intended to murder, and never actually participated in the murders of, Burleson and Littleton. In support of his theory of defense at trial, Gamble's counsel repeatedly argued to the jury that Gamble had no knowledge that Presley was going to shoot the victims; and that Gamble had no intent that they be killed; that Gamble did nothing to aid and abet Presley in the killings; and that, therefore, Gamble was guilty only of robbery and possibly attempted murder for firing a shot at Burleson. Gamble's claim that he did not know that Burleson and Littleton would be shot and killed, much less intend to kill them, bore directly on the issue whether Gamble did, in fact, intend that the victims be killed. Because Gamble's intent and knowledge when he entered the pawnshop were called into question, his prior actions in the robberies and shootings at the other stores were relevant to prove his intent and knowledge during the pawnshop robbery. The testimony concerning the collateral crimes was admissible because it was probative of matters in issue other than Gamble's bad character or his propensity to commit criminal acts.
"Furthermore, we find that the probative value of the collateral-crimes evidence clearly outweighed its prejudicial effect, particularly in view of Gamble's theory of defense at trial. Finally, the trial court's repeated limiting instructions, given after the testimony of each collateral-crimes witness, and given several times during the trial court's oral charge to the jury, were sufficient to apprize the jury of its responsibilities in considering the collateral-crimes evidence. Accordingly, the trial court did not abuse its discretion in admitting the evidence of the prior robberies and shootings committed by Gamble and Presley."
791 So.2d at 440-42.
Evidence of the Dale County murders was admissible to establish Wimberly's intent to commit the Houston County murder. Not only was intent a crucial element of the capital-murder charges but, as the circuit court noted, Wimberly placed his intent at issue in his cross-examination of the State witnesses and in his counsel's arguments to the jury. Wimberly presented evidence indicating that Evester Tharp was the shooter. It is clear that defense counsel attempted to place all of the blame for the murder on Wimberly's codefendant Tharp because, he argued, Tharp was in his thirties at the time of the murder and Wimberly was only 17 years old. This fact was brought out several times during counsel's closing argument. The issue of intent was especially crucial in this case; therefore, the probative value of the evidence outweighed its prejudicial impact.
Moreover, evidence of the Dale County murders was admissible under the exception to the general exclusionary rule allowing such evidence if it shows a common plan, design, scheme, system, or pattern. As stated in McElroy's Alabama Evidence:

*429 "Evidence of the accused's commission of another crime or act is admissible if such evidence, considered with other evidence in the case, warrants a finding that both the now-charged crime and such other crime or act were committed in keeping with or pursuant to a single plan, design, pattern, scheme or system. This rule is applicable whether such plan, design, pattern, scheme or system is narrow and specific in scope or is measurably broad and general in scope. The majority of decisions speak of this as the plan or scheme exception. Others, however, refer to it as proving a system or pattern. Dean McCormick spoke of it as justifying the admission of collateral crimes or acts when offered to prove `the existence of a larger plan, scheme, or conspiracy, of which the crime on trial is a part.'
"The present purpose differs from knowledge or intent in several respects. First, the plan, design, scheme or pattern is not an element of the crime charged and, consequently is always material or of consequence in the case. Such ever-present materiality causes the application of the exception to focus upon whether the other acts do indeed have a tendency to show a plan or scheme. A second difference lies in the fact that a single collateral crime or act could be sufficient to show knowledge or intent but, in contrast, it generally takes more than a single act to form a plan or scheme. Last, a greater degree of similarity between the charged crime and the collateral act is required when the latter is offered to prove plan or scheme rather than intent."
McElroy's Alabama Evidence § 69.01(6) (footnotes omitted).
Here, there were similarities between the murders. As this Court noted in our opinion reversing Wimberly's convictions for the Dale County murders:
"Six months later [after the Dale County murders], another person living near Dothan, Alabama, was murdered and her store and home, which was in the back of the store, was burglarized; the killers used the identical modus operandi as that used in the King murders."
Wimberly v. State, 759 So.2d 568, 569 (Ala. Crim.App.1999), cert. denied, 759 So.2d 574 (Ala.2000). Specifically, all three murders were residential robbery/murders, two perpetrators were involved in each case, the same weapon was used in all three murders, all the victims were shot in the head, a cash register was taken during the Houston County murder and a safe was taken in the Dale County murders, and Wimberly's fingerprints were found at each crime scene. The circuit court correctly allowed evidence of the Dale County murders to be introduced.

VII.
Wimberly argues that the circuit court erred in denying his motion to suppress the evidence seized as a result of the search of his bedroom at his mother's house.
At the suppression hearing, Deputy Richard St. John of the Houston County Sheriff's Department testified that he went to the home of Patricia Wade, Wimberly's mother, on June 24, 1997. He said that Wimberly lived in a room in his mother's house. St. John testified, and the signed consent form was introduced as State's Exhibit 5, that Wade signed a consent to search form. He further testified that she was not threatened or coerced to sign the form. St. John discovered ammunition for a 9 mm pistol in Wimberly's room.
Wimberly argued at trial and now on appeal that his mother could not legally give her consent to search his bedroom. *430 He analogizes the situation to one arising out of a landlord/tenant relationship and says that a landlord cannot give a valid consent to search a tenant's lodgings.
However, this Court has held that a parent's rights are superior to that of a child. As we recently reiterated in Reeves v. State, 807 So.2d 18, 33 (Ala.Crim.App. 2000) (on application for rehearing):
"In Burgess v. State, [811] So.2d [557] (Ala.Crim.App.1998), aff'd in pertinent part, rev'd on other grounds, [811] So.2d [617] (Ala.2000), we stated the following regarding the authority of a parent to consent to the search of a child's bedroom in the parents' home:
"`Burgess's contention that his mother did not have authority to consent to a search of his bedroom is likewise without merit. As this court stated in Taylor v. State, 491 So.2d 1042 (Ala.Cr.App.1986):
"`"`[T]he parent's rights are "superior to the rights of children who live in the house," which means . . . that the parent's consent would be effective even when the child was present and objecting.' W. LaFave, 2 Search and Seizure § 8.4 (1978). `Even if a minor child, living in the bosom of his family, may think of a room as "his," the overall dominance will be in his parents.' United States v. Di Prima, 472 F.2d 550, 551 (1st Cir.1973).
"`"` If a son or daughter, whether or not still a minor, is residing in the home of the parents, generally it is within the authority of the father or mother to consent to a police search of that home which will be effective against the offspring. This is unquestionably so as to areas of common usage, and is also true of the bedroom of the son or daughter when a parent has ready access for purposes of cleaning it or when because of the minority of the offspring the parent is still exercising parental authority. Because in the latter circumstances the parent's rights are "superior to the rights of children who live in the house," a parent's consent would prevail even if the child were present and objecting and even if the child had taken special measures in an effort to ensure he had exclusive use of the area searched.' W. LaFave, 1 Criminal Procedure § 3.10(e) (1984)."
"`491 So.2d at 1045.'
"[811] So.2d at [589-90].
"At the time of the search, the appellant was 18 years old and was living in his mother's house. The appellant concedes that his mother consented to the search of her house, including his bedroom. As the appellant's parent, Ms. Reeves clearly had the authority to consent to the search of the appellant's bedroom, which, lacking a door, was readily accessible to Ms. Reeves and to anyone else in her house. Accordingly, the trial court properly allowed the State to introduce the items of evidence seized from the appellant's bedroom. There was no error, plain or otherwise, in admitting this evidence."
Here, Wimberly was 17 years old and was living in his mother's house. It is uncontested that Wade consented to the search of her entire house. Wade's rights as a parent were superior to Wimberly's rights, and Wade could legally give her consent to search Wimberly's bedroom. The circuit court correctly denied the motion to suppress the evidence seized as result of the search.

VIII.
Wimberly argues that the circuit court's instruction on flight was incomplete as a matter of law.
*431 He admits in his brief to this Court that we should review this issue for plain error because the only argument made at trial was whether a flight instruction should be given, not whether the instruction given was sufficient.
As we previously stated in this opinion, Wimberly's death sentence is due to be set aside because he was 17 years of age when he committed the murder. Wimberly will be resentenced to the only other available sentencelife imprisonment without the possibility of parole. This Court is authorized to search a record for plain error only when the defendant has been sentenced to death. See Rule 45A, Ala.R.App.P. Therefore, this Court is permitted to review only those issues Wimberly properly raised and presented to the circuit court.[7] "We have repeatedly stated that this court has appellate jurisdiction only and cannot consider matters on appeal that have not first been presented to the trial court for its determination." Samuels v. Alabama Bd. of Pardons & Paroles, 687 So.2d 1287, 1290 (Ala. Crim.App.1996), citing Bamberg v. State, 611 So.2d 450 (Ala.Crim.App.1992). See also Pate v. State, 601 So.2d 210, 213 (Ala. Crim.App.1992). This issue was not first presented to the circuit court and will not be considered for the first time on appeal.

IX.
Wimberly argues that prosecutorial misconduct denied him a fair trial. Specifically, he argues that the prosecutor's repeated references to the term "psychopath" prejudiced him. However, this issue was not first presented to the circuit court and is not properly before this Court for appellate review. See Samuels v. Alabama Bd. of Pardons & Paroles, supra.
Based on the United States's Supreme Court's decision in Roper v. Simmons, this case is remanded to the Houston County Circuit Court for that court to set aside Wimberly's sentence of death and to resentence Wimberly to life imprisonment without the possibility of parole. The circuit court shall take all necessary action to ensure that the return to remand is filed in this Court within 35 days from the date of this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS AS TO SENTENCE.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.

On Return to Remand
McMILLAN, Presiding Judge.
The appellant, Shaber Chamond Wimberly, was convicted of two counts of capital murder for murdering Mary Spivey during the course of a robbery and a burglary. See § 13A-5-40(a)(2) and (a)(4), Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Wimberly be sentenced to death. The circuit court sentenced Wimberly to death. We affirmed Wimberly's capital-murder convictions, but we remanded the case to the Houston Circuit Court for that court to set aside Wimberly's sentence of death and to impose a sentence of life without the possibility of parole because Wimberly was 17 years of age when he committed the murder. See Wimberly v. State, 934 So.2d 411 (Ala.Crim.App.2005), citing the United States Supreme Court's decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), (holding that it was a violation of the Eighth and Fourteenth *432 Amendments to impose a death sentence on an offender who was under the age of 18 at the time the offense was committed).
The circuit court has complied with our directions and has filed its amended sentencing order with this Court. The court has set aside Wimberly's death sentence based on the United State Supreme Court's decision in Roper and imposed the only other available sentencelife in the penitentiary without the possibility of parole.
In our previous opinion we addressed the other issues raised by Wimberly in his brief to this Court, and we affirmed Wimberly's capital-murder convictions. Wimberly's sentence is now due to be, and is hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] Wimberly's codefendant, Evester Tharp, was convicted of capital murder and was sentenced to life imprisonment without the possibility of parole. His conviction was affirmed on direct appeal. See Tharp v. State (No. CR-01-1234), 886 So.2d 179 (Ala.Crim.App.2003) (table).
[2] Butler pleaded guilty to five counts of capital murder for his involvement in the Dale County double homicide.
[3] Wimberly was convicted for five counts of capital murder and was sentenced to death for murdering Max and Johneen King. His conviction was reversed on direct appeal because of the erroneous admission at trial of his statement to police. See Wimberly v. State, 759 So.2d 568 (Ala.Crim.App.1999). Wimberly was retried and was again convicted of capital murder and sentenced to death. That appeal is currently pending before this Court (appeal no. CR-00-1772).
[4] Wimberly was convicted of five counts of capital murder for the killings of Max King and Johneen King in Dale County. See note 3.
[5] Barrentine is a defendant in an unrelated criminal case that received substantial publicity in the area.
[6] The circuit court stated, "I didn't intend to let anybody on the jury that knows about a conviction in Dale County." (R. 683.)
[7] However, jurisdictional issues may be raised at any time, whether or not there was an objection raised in the circuit court. See Hunt v. State, 659 So.2d 998, 999 (Ala.Crim. App.1994).