[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 764 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 765 
William Bruce Marshall was convicted of two counts of capital murder for the killing of Alicia Nicole Bentley: one count of murder made capital because it occurred during a burglary, § 13A-5-40(a)(4), Ala. Code 1975, and one count of murder made capital because it occurred while Marshall, who was over the age of 19 years, sexually abused or attempted to sexually abuse Alicia, who was between the ages of 12 and 16 years, [1]
§ 13A-5-40(a)(8), Ala. Code 1975. The jury did not convict Marshall of having raped Alicia, as was also alleged in the indictment. By a vote of 11 to 1, the jury recommended that Marshall be sentenced to death. The trial court followed the jury's recommendation and sentenced Marshall to death.
Marshall did not deny that he killed 15-year-old Alicia. Indeed, while in police custody he confessed to the killing and eventually led police to Alicia's body. His attorneys, however, presented a defense in which Marshall attempted to call into question the allegation that he had had any kind of sexual contact with Alicia.
The evidence adduced at trial tended to show the following facts. On December 28, 2004, Tonya Bentley called the Vestavia Hills Police Department to report that her daughter, Alicia, was missing from their apartment. Tonya Bentley and Marshall had separated in early December 2004. Tonya, Alicia, and Tonya's newborn son had moved from the apartment they had shared with Marshall into an apartment in a different complex. Tonya still had personal belongings at Marshall's, and her name was on the lease for that apartment.
Tonya told police that she believed that Marshall may have known of Alicia's whereabouts. She based her belief on the fact that she had discovered a videocassette recorder, or VCR, that Alicia had left at the old apartment in a chair in the new apartment when she got home. Tonya was positive that the VCR had not been in the apartment when she left for work that morning. When Tonya called Marshall to ask whether he had seen Alicia that day, however, he denied having come to the apartment.
Further, Tonya and Marshall had spoken earlier that day about the possibility of Marshall bringing Tonya the washer *Page 766 
and dryer. Tonya said that Marshall asked her when she would be home so that he could bring the appliances over. He also said he was going to rent an appliance dolly to make the move easier.
After speaking with Tonya, police alerted other law-enforcement agencies to be on the lookout for Alicia. Police went to Marshall's apartment, where they could hear the dryer running inside, but no one answered the door when they knocked. Marshall's truck was parked outside the apartment, and neighbors said that they had seen him go into the apartment but had not seen him come back out. Police attempted to call Marshall and have neighbors call Marshall, but no one answered the telephone inside the apartment.
Tonya attempted to open the front door with her key, but the lock had been changed. The manager of the apartment complex also attempted to open the lock with the master key, but that key did not work, either. After receiving permission from Tonya to enter the apartment, police simultaneously broke down the front and back doors to the apartment and found Marshall inside.
Detective Mike O'Connor of the Vestavia Hills Police Department testified that, as police searched the apartment, Marshall was handcuffed both for his safety and for the safety of the police. Alicia was not found in Marshall's apartment, and O'Connor asked Marshall to come to city hall with him. Marshall agreed and the police took him to city hall. O'Connor said that he told Marshall that he was not under arrest at that time and removed the handcuffs from him before he got into the car.
O'Connor said that even though Marshall had not been arrested at that point, he was advised of his rights pursuant to Mirandav. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966), while they were still at the apartment. O'Connor said that he advised Marshall of his rights again once they reached his office. Marshall signed a waiver-of-rights form and initially denied knowing anything about Alicia's whereabouts. O'Connor said that he explained to Marshall that he was not under arrest and that he was free to leave, but because the doors were broken at the apartment, Marshall chose to stay at city hall. O'Connor testified that the only place he had for Marshall to stay was in a cell, but that Marshall only had to ask to leave and he would have been free to go that night.
Police continued to investigate Alicia's disappearance throughout the night of December 28 and into the morning hours of December 29, 2004. During their investigation, they discovered clothes, shoes, a purse, and a comforter identified as Alicia's in a dumpster at an apartment complex next to the apartment complex where Marshall lived. Their investigation also showed that Marshall left work and was unaccounted for during several hours the afternoon of December 28.
On the morning of December 29, after finding the comforter, clothes, and purse, police got an arrest warrant for Marshall based on kidnapping. In addition, law-enforcement officials discovered Alicia's driver's license and her library card in a dumpster at Marshall's job site. Once police obtained the kidnapping warrant, O'Connor said, Marshall was arrested, and he was no longer free to leave. Marshall was not questioned again until about 1:00 p.m. on the afternoon of December 29.
Agents from the Federal Bureau of Investigation ("FBI") assisted the Vestavia Hills Police Department in questioning Marshall. When FBI agents interrogated Marshall, they also advised him of his Miranda rights. Marshall signed a form indicating that he understood his rights. *Page 767 
While the agents were questioning Marshall the evening of December 29, one day after Alicia had been reported missing, Marshall admitted that he "had done a terrible thing." (R. 444.) Agent Scott Keeler of the FBI said that Marshall told him he "had gotten into a verbal argument with Alicia that had become violent and he had struck her in the head with his fist." (R. 444.) He said he was not sure whether she was okay and that he had taken her out in the country and dropped her off.
Marshall rode with law-enforcement officials to an area outside Columbiana. After searching off various side roads, Marshall was finally able to lead authorities to Alicia's body. She was nude, except for a pair of white socks.
Dr. Art Shores, a forensic pathologist with the Alabama Department of Forensic Sciences, testified that he performed an autopsy on the body, which revealed that Alicia had been strangled to death. Dr. Shores also testified that Alicia had a small vaginal mucosal tear. The tear probably occurred within 24 to 48 hours of Dr. Shores's examination of the body, which was conducted on December 30, 2004.
 I.
Marshall contends that the trial court erred in allowing the State to offer his confession and other evidence obtained as a result of what he alleges was an illegal arrest. Specifically, Marshall contends that police had no probable cause to arrest him when they first took him from the apartment to the Vestavia Hills Police Department. Because, he says, his arrest was illegal, Marshall asserts that the confession he gave to law-enforcement officials was due to be suppressed.
The State argues that Marshall was not under arrest when he left the apartment with Detective O'Connor. The State points to the facts that Marshall voluntarily agreed to accompany O'Connor to city hall, that the handcuffs were removed before Marshall got into the police car, and that he was free to leave city hall at any time the night of December 28, 2004. It was not until after the kidnapping warrant was issued that Marshall was placed under arrest.
"This Court reviews de novo a circuit court's decision on a motion to suppress evidence when the facts are not in dispute."State v. Skaggs, 903 So.2d 180, 181
(Ala.Crim.App. 2004). "A trial court's ultimate legal conclusion on a motion to suppress based on a given set of facts is a question of law that is reviewed de novo on appeal." Statev. Hargett, 935 So.2d 1200, 1204 (Ala.Crim.App. 2005).
Detective O'Connor testified that Marshall was not under arrest when he agreed to accompany officers to city hall or when he voluntarily spent the night in a cell because the doors to his apartment had been broken down. In cases such as this one where there has not been a formal arrest, "`an objective test is used to determine whether the suspect's freedom of action has been restricted by the police in any significant manner.'"Barksdale v. State, 788 So.2d 898, 903 (Ala.Crim.App. 2000), quoting Hooks v. State, 534 So.2d 329, 348
(Ala.Crim.App. 1987). "`"The only relevant inquiry is how a reasonable man in the suspect's position would have understood his position."'" Id., quoting Hooks,534 So.2d at 348, quoting in turn United States v. Jonas,786 F.2d 1019, 1022 (11th Cir. 1986). The United States Supreme Court has long held that "a person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." UnitedStates v. Mendenhall, 446 U.S. 544, *Page 768 
554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). A person's decision to voluntarily accompany officers to the police station to answer questions about a missing person does not support a conclusion that that person is under arrest. Smith v.State, 797 So.2d 503, 529 (Ala.Crim.App. 2000).
Here, undisputed evidence showed that after police failed to find Alicia in Marshall's apartment, Detective O'Connor "asked [Marshall] if he wanted to come up and talk to me and he said yes." (R. 18.) Although Marshall was initially handcuffed for safety purposes when police first entered his apartment, the handcuffs were removed before he went with police to city hall. O'Connor said that Marshall understood that he was not under arrest. Once at city hall, O'Connor talked with Marshall in his office for approximately 20 minutes. O'Connor said he then gave Marshall the choice between being taken back to his apartment, where the doors were broken, or staying at city hall for the rest of the night. O'Connor said Marshall made the choice to stay. O'Connor also testified that he told Marshall the only place he had for him was a cell. O'Connor said that despite being in a locked cell, O'Connor was free to leave at any time, "[a]U he had to do was ask." (R. 19.)
The following morning, after law-enforcement officials continued their investigation into Alicia's disappearance and discovered her clothes and purse in a dumpster near Marshall's apartment, police obtained a kidnapping warrant for Marshall. It was at that time that he was placed under arrest, according to O'Connor. He confessed to hitting Alicia and to taking her out to the country, where he left her late that night.
Based upon the evidence presented, we cannot say that the trial court acted improperly in admitting Marshall's confession into evidence. We recognize that having the doors to one's home broken down and being handcuffed while police searched the home would be disconcerting. Nonetheless, there is no evidence to contradict the State's assertion that Marshall voluntarily accompanied police to city hall. Furthermore, there is no evidence to contradict the State's assertion that Marshall voluntarily chose to stay in a cell the night of Alicia's disappearance because the doors to his apartment had been broken. The evidence shows that Marshall and O'Connor spoke in O'Connor's office and not in an interrogation area; their conversation only lasted about 20 minutes, after which O'Connor offered to take Marshall back to his apartment. Based upon this evidence, a reasonable man would not have understood that he was under arrest.
Even if we were to find that Marshall's stay at city hall the night of December 28 constituted an illegal arrest, his confession would still be admissible.[2] *Page 769 
 "Where a Fourth Amendment violation `taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation."
Oregon v. Elstad, 470 U.S. 298, 306, 105 S.Ct. 1285,84 L.Ed.2d 222 (1985) (citation omitted). In Elstad, the Supreme Court was discussing the doctrine derived from WongSun v. United States, 371 U.S. 471, 83 S.Ct. 407,9 L.Ed.2d 441 (1963), which states that "`a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is "sufficiently an act of free will to purge the primary taint."`" Oregon v. Elstad, 470 U.S. at 306,105 S.Ct. 1285, quoting Taylor v. Alabama,457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), quoting in turnBrown v. Illinois, 422 U.S. 590, 602, 95 S.Ct. 2254,45 L.Ed.2d 416 (1975).
Admissibility of a confession obtained after an illegal arrest hinges on whether the confession was obtained by exploitation of the illegal arrest, and such a confession may be admissible if it was obtained by means sufficiently distinguishable from the arrest so as to be purged of the primary taint. WongSun, 371 U.S. at 486-87, 83 S.Ct. 407. In assessing the admissibility of a statement given in the wake of an illegal arrest, courts consider: (1) the proximity in time between the arrest and the confession; (2) the presence of intervening circumstances; (3) the purpose and flagrancy of police misconduct; and (4) whether the defendant receivedMiranda warnings. Brown v. Illinois,422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
Here, if we were to consider Marshall to have been arrested from the time police entered his apartment and handcuffed him on the evening of December 28, 2004, then his confession was given some 30 hours later — the night of December 29 or the earliest morning hours of December 30. Several crucial intervening circumstances took place in that time. Marshall was advised of his Miranda rights before leaving the apartment. He spoke with Detective O'Connor at O'Connor's office after once again being advised of his rights and executing a waiver of those rights. It was *Page 770 
undisputed that O'Connor offered to drive Marshall back to his apartment. Detective O'Connor also gave Marshall the option of staying at the Vestavia City Hall that night, because the doors to Marshall's apartment had been broken when the police entered the apartment. Police continued an independent investigation into Alicia's disappearance and discovered her clothing, her purse and the comforter from her bed, which had been discarded near Marshall's apartment. From the evidence, police were able to obtain a kidnapping warrant for Marshall's arrest the morning of December 29. When FBI agents questioned Marshall, they, too, advised him of his rights and had him sign an acknowledgment that he understood those rights. All of these facts, taken together, provide sufficient intervening circumstances that would have broken the causal connection between the allegedly illegal arrest and Marshall's confession. See R.L.A.C. v.State, 823 So.2d 1288 (Ala.Crim.App. 2001), and Crawfordv. State, 479 So.2d 1349, 1353-54 (Ala.Crim.App. 1985). Accordingly, Marshall's confession was properly admitted into evidence.
 II.
Marshall contends that the trial court erred in not granting his motion for a judgment of acquittal on the charges of capital murder because, he said, the State failed to meet its burden of proving that Alicia's murder occurred during the course of a burglary or during sexual abuse.
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State,720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v.State, 471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd,471 So.2d 493 (Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v.State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quotingO'Neal v. State, 602 So.2d 462, 464
(Ala.Crim.App. 1992). `"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696
(Ala.Crim.App. 1998), quoting Ward v. State,557 So.2d 848, 850 (Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parteBankston, 358 So.2d 1040, 1042 (Ala. 1978).
 A.
Marshall asserts that the State failed to present sufficient evidence to prove that he committed a burglary, that is, that he unlawfully entered the apartment where Alicia lived with her mother with the intent to commit a crime. Murder made capital because it was committed during a burglary is defined in § 13A-5-40(a)(4), Ala. Code 1975, as "[m]urder by the defendant during a burglary in the first or second degree or an attempt thereof committed by the defendant."
 "A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he or another participant in the crime: *Page 771 
 "(1) Is armed with explosives or a deadly weapon; or
 "(2) Causes physical injury to any person who is not a participant in the crime; or
 "(3) Uses or threatens the immediate use of a dangerous instrument."
§ 13A-7-5(a), Ala. Code 1975.[3]
The indictment charges that Marshall unlawfully entered or remained in Alicia's apartment with the intent to commit assault. (R. 31.)
The evidence elicited during the trial showed that Marshall and Alicia disliked each other intensely. Another of Marshall's ex-wives, also named Tonya and referred to during the trial as Tonya Marshall, testified that Marshall blamed Alicia for the problems in his marriage with Tonya Bentley and believed Alicia was the reason they had moved out. Tonya Marshall said that Marshall told her that he "hated" Alicia and that Alicia had her mother "wrapped around her little finger, and that she could do anything — she could get her mom to do anything she wanted her to." (R. 289.) Tonya Marshall said that even after Tonya and Alicia Bentley moved out, Marshall still dwelled on things Alicia had done to make him angry, such as failing to clean the house or do the laundry.
Marshall's feelings about Alicia were mutual. The State introduced into evidence an essay Alicia had written in school describing the best time of her life as the "moment" when her mother decided to divorce Marshall. In the essay, Alicia wrote that Marshall was "the one person who made me wish I'd never have to go home. He was the reason I dreaded the sound of the last bell at school." (R. 321.) Just as Marshall had told his ex-wife that he hated Alicia, Alicia wrote that at first she resented Marshall, then she grew to hate him. She also wrote that she had not seen Marshall after she, her mother and brother moved out of the apartment they had shared with Marshall, "and I hope I never will." (R. 323.)
The evidence showed that on the morning of December 28, 2004, Marshall called Tonya Bentley to say that day would be good for them to move the washer and dryer from his apartment to Tonya's. Marshall said he would rent an appliance dolly and asked Tonya what time she would be home. Despite finding receipts and other indicia of errands Marshall had run that day, however, law-enforcement officials found no evidence that Marshall had rented a dolly. When police went to Marshall's apartment the evening of December 28 to ask him if he had seen Alicia or if he knew of her whereabouts that day, they heard the dryer running, meaning he had not even disconnected the appliance to move it to Tonya's apartment.
Marshall went to Alicia and Tonya's apartment at a time when he knew Tonya would not be home. When Tonya Bentley returned home from work on December 28, she found Alicia's VCR, which had been left at Marshall's apartment, on a chair in the living room of her new apartment. She also found signs of a struggle in Alicia's bedroom, including the fact that the mattress had been knocked askew on the bedframe and a large swath of writing on a message board above Alicia's bed had been smudged. "Evidence of a struggle that gives rise to circumstantial evidence of revocation of a license or privilege can be used to show an unlawful remaining, a *Page 772 
separate prong of the offense of burglary upon which a conviction can be based." Davis v. State,737 So.2d 480, 483 (Ala. 1999). In Davis, the Alabama Supreme Court held that the evidence of a struggle between Davis and the victim gave rise to the inference that Davis remained in the victim's dwelling unlawfully because of Davis's "choice to kill by a less-than-in-stantaneous technique of strangulation."Davis, 737 So.2d at 484. Based upon the circumstances suggested by that evidence, the Supreme Court found, "the jury reasonably could have found that Davis, from the point at which he began committing his criminal acts, `remain[ed] unlawfully' in [the victim's] home with the intent to commit a crime."Id.
In his confession to law-enforcement officials, Marshall said that he went to Tonya's apartment intending to talk with Alicia about helping him reconcile with Tonya. Jurors could reasonably believe that, given the animosity between Marshall and Alicia, Marshall's explanation for going to the house was not believable. From the evidence presented, jurors reasonably could have believed that, after ascertaining a time when Alicia would be home alone, Marshall took the VCR to the apartment as a means of getting into the apartment with the intent of harming Alicia.
Even if Marshall had entered the apartment with no nefarious intentions, from the evidence of a struggle and Marshall's own admission that he hit Alicia, the jury could have reasonably found that he remained in the apartment unlawfully with an intent to harm Alicia. Marshall admitted to hitting Alicia in the head. The inference that he remained in the apartment illegally is bolstered by the fact that after hitting Alicia, Marshall made the decision to remain in the apartment for the purpose of strangling her. See Davis, 737 So.2d 480.
He also told police that when he arrived at the apartment, Alicia came to the door wrapped only in a towel. When Alicia was found, she was nude. From such evidence, the jury could also reasonably infer that, even if Marshall had been invited into the apartment, he remained there to attack Alicia for his sexual gratification.
Accordingly, we hold that the State presented legally sufficient evidence from which the jury could reasonably find Marshall was guilty of murder made capital because it occurred during the course of a burglary.
 B.
Marshall also contends that the State failed to present sufficient evidence from which a jury could convict him of murder made capital because it occurred during the sexual abuse of the victim.
Murder made capital because it was committed during sexual abuse is defined as "[m]urder by the defendant during sexual abuse in the first or second degree or an attempt thereof committed by the defendant." § 13A-5-40(a)(8), Ala. Code 1975. Sexual abuse in the second degree is defined in pertinent part as follows: "A person commits sexual abuse in the second degree if he, being 19 years old or older, subjects another person who is less than 16 years old but more than 12 years old, to sexual contact." § 13A-6-67(a)(2), Ala. Code 1975. "Sexual contact" is defined in § 13A-6-60(3), Ala. Code 1975, as "[a]ny touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party." "`Thus, when prosecuting sexual abuse . . ., the State must prove an element of intent, i.e., the intent to gratify sexual desire.'" D.D.C. v. State, *Page 773 
928 So.2d 327, 329 (Ala.Crim.App. 2005), quoting Stafford v. State,873 So.2d 1168, 1170 (Ala.Crim.App. 2003). "[T]he intent to gratify the sexual desires of either party may be inferred from the act itself." Worthy v. State, 724 So.2d 55, 58
(Ala.Crim.App. 1998) (opinion on return to remand); andA.B.T. v. State, 620 So.2d 120 (Ala.Crim.App. 1992).
In this case, the State presented evidence that, within the year before Alicia's murder, Tonya Bentley saw Marshall looking into the bathroom window while Alicia was taking a shower. Tonya Bentley found photographs of Alicia in a swimsuit inside one of Marshall's dresser drawers when she was cleaning out his apartment after his arrest.
Tonya Bentley testified that Alicia never left the bathroom in the morning without being dressed and that she would not allow her mother in the bathroom until she was finished dressing.
Kathryn Carter, who worked at the apartment complex where Alicia and Tonya lived, testified that on December 28, 2004, the day Alicia disappeared, she saw Alicia at about 12:30 or 12:45 p.m. walking her dog. At that time, Alicia was fully dressed. Carter also said that at the same time, she saw in the apartment parking lot a red pickup truck with a sticker on a window on the driver's side and a tool box. She identified a photograph of Marshall's pickup truck as being the truck she had seen in the parking lot.
In his statement to law-enforcement officials, Marshall said that Alicia answered the door that afternoon wrapped only in a towel. When Alicia's body was discovered, she was nude except for a pair of white socks. She was also wearing jewelry. The forensic pathologist who performed the autopsy on Alicia's body discovered a vaginal mucosal tear, which probably occurred within 24 to 48 hours of Dr. Shores's examination of the body, which was conducted on December 30, 2004.
From this evidence, the jury reasonably could have found that Marshall, who was well over the age of 16 years, had harbored sexual feelings toward Alicia, who was 15 years old. On the day of her disappearance, Alicia was seen fully dressed at between 12:30 and 12:45 p.m., at the same time a witness saw Marshall's truck in the parking lot of Alicia's apartment complex. In his statement, Marshall said that after dropping Alicia off near Columbiana, he returned to work at approximately 3:05 p.m. on December 28.
A jury could have determined that it would not be in character for Alicia to answer the door wearing only a towel. Furthermore, the jury may have determined that there was insufficient time for Alicia to take, or even prepare for, a shower or bath between the time she finished walking the dog and the time Marshall had to have entered the apartment, given the time that elapsed between the time Alicia was seen outside and the time Marshall returned to work after taking Alicia's body from Vestavia Hills to a location near Columbiana.
Furthermore, the forensic pathologist determined that the vaginal mucosal tear occurred 24 to 48 hours before the autopsy on December 30, meaning the opportunity for such an injury to occur was probably on December 28, the day Alicia was killed, and not some time earlier.
From this evidence, the jury could reasonably have inferred that Marshall murdered Alicia during the course of having, or attempting to have, sexual contact with her.
For the reasons set forth in this portion of this opinion, we hold that the trial court properly denied Marshall's motion for a *Page 774 
judgment of acquittal based on the sufficiency of the evidence.
 III.
Marshall contends that the trial court erred in allowing the State to offer evidence of a collateral bad act. Specifically, Marshall asserts that the trial court erred in allowing Tonya Bentley to testify regarding her discovery of Marshall peeping into the bathroom window where Alicia was taking a shower.
Whether to admit collateral evidence as proof of motive or intent is a matter within the sound discretion of the trial court. See Key v. State, 891 So.2d 353, 365-66
(Ala.Crim.App. 2002).
Marshall correctly asserts that Rule 404(b), Ala. R. Evid., provides for the exclusion of evidence of prior bad acts in certain circumstances. Rule 404(b) provides, in pertinent part:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ."
In Robinson v. State, 528 So.2d 343
(Ala.Crim.App. 1986), this Court explained the purpose behind the exclusionary rule.
 "`"`On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.'" "`This exclusionary rule is simply an application of the character rule, which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.'" Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. "`The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged.'"
 "`If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.' The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. `"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it *Page 775 
must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."' `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citation omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"'"
Robinson, 528 So.2d at 347 (citations omitted). See also Rule 404(b), Ala. R. Evid.; Charles W. Gamble,McElroy's Alabama Evidence § 69.01 (5th ed. 1996).
Marshall contends that the only purpose of introducing evidence of the peeping incident was to show evidence of his bad character. As discussed above, however, to prove that Alicia's murder occurred during sexual abuse, the State had to prove that Marshall engaged in sexual contact with Alicia with the intent to gratify sexual desire. D.D.C. v. State,928 So.2d 327, 329 (Ala.Crim.App. 2005).
The State elicited testimony from Tonya Bentley regarding the peeping incident, not to establish guilt, but to establish intent. Evidence that Marshall surreptitiously attempted to watch Alicia while she was showering tended to show that he had an unnatural prurient interest in his stepdaughter. Such evidence was required for the jury to find that Marshall had the requisite intent to gratify sexual needs, an essential element of the crime of sexual abuse that the State had to prove. Alabama law has consistently held that evidence of collateral acts is admissible for such purposes. See Irvin v.State, 940 So.2d 331, 349 (Ala.Crim.App. 2005); andWimberly v. State, 934 So.2d 411, 426-27
(Ala.Crim.App. 2005) (and cases cited therein). Therefore, the trial court properly allowed Tonya Bentley's testimony regarding the peeping incident, which occurred in the year leading up to Alicia's murder.
 IV.
Marshall contends that the trial court erred in granting the State's motion in limine seeking to preclude Marshall from introducing into evidence certain notes Alicia had written to her boyfriend regarding sexual activity, which, Marshall asserts, could explain how Alicia could have sustained the vaginal mucosal tear.
The decision to grant or deny a motion in limine rests within the sound discretion of the trial court, and that decision will not be overturned on appeal absent an abuse of discretion.Hulsey v. State, 866 So.2d 1180, 1188 (Ala.Crim.App. 2003).
Marshall contended that the notes were relevant to his defense because the State intended to prove sexual abuse by means of evidence of a tear that had been found on Alicia's vagina. The notes would have provided another possible explanation for how she suffered the tear, i.e., that the tear was sustained while Alicia was having sexual relations with her boyfriend.
The State argued that because one of the two notes was dated on November 9, 2004, some seven weeks before Alicia's murder, it was due to be excluded as being too remote to be relevant to an injury that occurred within 24 to 48 hours before the coroner's examination on December 30, two days after her murder.
The second note, which was found in Alicia's purse, was undated. The contents *Page 776 
of that note indicated that Alicia and her boyfriend had broken up. There was no evidence indicating that the notes were sent to the boyfriend. Additionally, Marshall could have called the boyfriend as a witness to establish that the boyfriend had had sexual relations with Alicia, and when he had done so.
The trial court determined that the notes were not relevant. The trial court appeared to find that the note dated November 9 was too remote in time to be relevant. Because the second note was undated and when it was written could not be determined, the trial court also questioned its relevance and precluded it from being admitted into evidence.
"Rulings on the materiality, relevancy, and remoteness of evidence are matters resting within the discretion of the trial court. Such rulings will not be disturbed . . . unless there is a showing that the court's ruling was a gross abuse of discretion." Moseley v. Lewis Brackin,583 So.2d 1297, 1300 (Ala. 1991).
Whether Alicia was involved in sexual relations with her boyfriend seven weeks before the murder is not relevant to the case at bar. There was no evidence presented at trial that would shed light on when the second note was written. Regardless, the note tended to show that Alicia had broken up with her boyfriend, which, logically, would have been more helpful to the prosecution than to Marshall's defense. Based upon the record before us, we cannot say that the trial court improperly granted the State's motion in limine to preclude the notes from being introduced into evidence.
 V.
Because Marshall has been sentenced to death, this Court must review these proceedings for plain error. Rule 45A, Ala. R.App. P., states:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
When discussing the application of the plain-error standard of review, this Court has stated:
 "The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1
(1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742
(Ala.Crim.App. 1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Crim.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993), on remand, 620 So.2d 714 (Ala.Crim.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, 820 So.2d 113, 121-22
(Ala.Crim.App. 1999), aff'd, 820 So.2d 152 (Ala. 2001). Although the failure to object will not preclude our review, it will weigh against any claim of prejudice. See Dill v. *Page 777 State, 600 So.2d 343 (Ala.Crim.App. 1991), aff'd,600 So.2d 372 (Ala. 1992).
We have searched the record for any error that may have adversely affected Marshall's substantial rights. We found no plain error as to the guilt phase of his trial. See Rule 45A, Ala. R.App. P.
During the trial court's charge to the jury at the penalty phase of Marshall's trial, the court instructed the jury regarding aggravating circumstances and mitigating circumstances. The court explained that the jury was to determine whether any aggravating circumstances existed, "and, if so, whether the aggravating circumstances outweighed the mitigating circumstances." (R. 778.)
The court correctly instructed the jury that if it did not find any aggravating circumstances, it must return a verdict recommending that Marshall's punishment be life in prison without the possibility of parole. If, on the other hand, the jury found beyond a reasonable doubt that one or more aggravating circumstances did exist, it must consider and determine the mitigating circumstances. The jury must then weigh the aggravating circumstances against the mitigating circumstances. The trial court charged the jury that if it was "convinced that the aggravating circumstance or circumstances outweighed the mitigating circumstance or circumstances" the verdict would be a recommendation for imposition of the death penalty. (R. 790.) If the jury determined "that the mitigating circumstance or circumstances outweigh any aggravating circumstance or circumstances that exist, or that no aggravating circumstances exist," then the verdict would be a recommendation of life imprisonment without the possibility of parole. (R. 790.)
In its sentencing order, the trial court wrote that it charged the jury
 "that if the mitigating circumstances outweighed the aggravating circumstances as presented to the jury, then the punishment would be affixed at life imprisonment without the eligibility of parole. But if the aggravating circumstances outweighed the mitigating circumstances then the punishment would be affixed at death."
(Supp. R. 19-20.)
Marshall did not object to these instructions, and on appeal, he did not contend that the instructions as set forth above constituted error. We review these instructions for plain error, that is, an error that "`"seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."`"Ex parte Davis, 718 So.2d 1166, 1174 (Ala. 1998), quoting Kuenzel v. State, 577 So.2d 474, 489
(Ala.Crim.App. 1990), quoting in turn United States v.Butler, 792 F.2d 1528, 1535 (11th Cir. 1986).
Alabama's death-penalty statutory scheme provides that "[i]f the jury determines that one or more aggravating circumstances as defined by Section 13A-5-49 exist but do not outweigh themitigating circumstances, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole." § 13A-5-46(e)(2), Ala. Code 1975 (emphasis added). By providing that if the aggravating circumstances do not outweigh the mitigating circumstances, the statute encompasses those situations in which the jury determines that the aggravating circumstances and the mitigating circumstances are equally balanced.
The trial court's instruction to the jury in this case, however, stated only that a verdict recommending a punishment of life imprisonment without the possibility of parole would be appropriate if the mitigating circumstances outweighed the aggravating *Page 778 
circumstances. The instructions did not provide the jury with any guidance as to the proper verdict if it found that the aggravating circumstances and the mitigating circumstances were equally balanced.
The Alabama Supreme Court addressed this issue in Ex parteMcNabb, 887 So.2d 998 (Ala. 2004). In that case, the trial court instructed the jury as follows during the sentencing phase of the trial:
 "`[I]f, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstances, then your verdict would be: "We, the jury, recommend that the defendant be punished by death, and the vote is as follows. . . ." However, if after a full and fair consideration of all of the evidence in this case, you determine that the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole. . . .'"
McNabb, 887 So.2d at 1001. Thus, just as in this case, the language used in instructing the jury in McNabb did not specifically instruct the jury on what to do if the aggravating circumstances and mitigating circumstances were in balance.
The Alabama Supreme Court held that although the trial court did not instruct the jury as to what to do when the mitigating circumstances and the aggravating circumstances were in balance, "the jury [in McNabb] was not invited to recommend a sentence of death without finding any aggravating circumstance."Id. at 1004. The Supreme Court then held that, in considering the jury charge in its entirety, it could not conclude that "the error `seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,'Ex parte Davis, 718 So.2d at 1173-74, so as to require a reversal of the sentence." McNabb, 887 So.2d at 1004.
After reviewing the trial court's charge to the jury during the penalty phase in this case, we likewise cannot conclude that the trial court's failure to instruct the jury as to what to do if the aggravating circumstances and the mitigating circumstances were equally balanced seriously affected the fairness, integrity, or public reputation of this trial. When charging the jury regarding mitigating circumstances and the weight to be given to them, the court should reiterate that the aggravating circumstances must outweigh the mitigating circumstances in order for a juror to vote to return a verdict recommending death, and that if the aggravating circumstances do not outweigh the mitigating circumstances, which would be encompassed in a decision that the weight of the aggravating circumstances are equal to the weight of the mitigating circumstances, then a vote recommending life without parole would result. This would make clear to the jury that, in those instances when the mitigating circumstances and the aggravating circumstances are equally balanced, a verdict recommending the death penalty would not be appropriate.
 VI.
Pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of Marshall's conviction and sentence of death. Section 13A-5-53, Ala. Code 1975, requires that we review the propriety of Marshall's death sentence to determine whether any error adversely affecting the rights of the defendant occurred *Page 779 
in the sentence proceedings; whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and whether death is the appropriate sentence in the case. In determining whether death is the proper sentence, we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After evidence was presented to the jury during the penalty phase of Marshall's trial, the jury, by a vote of 11 to 1, recommended a sentence of death.
Pursuant to 13A-5-47, Ala. Code 1975, the trial court held a subsequent sentencing hearing to aid it in determining whether it would sentence Marshall to death or to life imprisonment. In its sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Marshall's participation in it.
In its findings, the trial court found the existence of the following statutory aggravating circumstances: (1) that the capital offense was committed while Marshall was under sentence of imprisonment; (2) that Marshall had previously been convicted of a felony involving the use or threat of violence to the person; and (3) that Marshall was engaged in the commission of a burglary at the time the capital offense was committed.
The trial court found no statutory mitigating circumstances existed. It further found that there were no nonstatutory mitigating circumstances. It should be noted that Marshall presented no evidence in mitigation during the penalty phase of the trial or at the sentencing hearing before the trial court.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Marshall to death by lethal injection.
Marshall was convicted of capital murder because he committed the murder during the course of a burglary, a violation of § 13A-5-40(a)(4), Ala. Code 1975, and during sexual contact or attempted sexual contact with a person older than 12 years but younger than 16 years, a violation of § 13A-5-40(a)(8).
Marshall told one of his ex-wives that he blamed his 15-year-old stepdaughter, Alicia, for the breakup of his current marriage. He called Alicia's mother, Tonya Bentley, to determine when Tonya would not be home, then went to the apartment and hit, strangled, and sexually abused Alicia before taking her to a secluded spot and leaving her nude body on the ground. He told police he did not know whether Alicia was dead when he left her.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), *Page 780 
Ala. Code 1975. Furthermore, after weighing independently the aggravating circumstances and the mitigating circumstances, this Court is convinced that death was the appropriate punishment in this case.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Marshall's sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Marshall committed murder during the course of a burglary and during the sexual abuse of a minor between the ages of 12 and 16 years. Marshall is older than 19 years of age. Marshall's sentence was not disproportionate or excessive when compared to penalties imposed in similar cases. See Brown v. State, [Ms. CR-04-0293, June 29, 2007] ___ So.2d ___ (Ala.Crim.App. 2007) (death appropriate penalty for defendant convicted of murder committed during the course of a robbery and burglary); Hall v. State, 979 So.2d 125
(Ala.Crim.App. 2007) (death appropriate penalty for defendant convicted of murder committed during the course of a burglary);Jones v. State, 987 So.2d 1156 (Ala.Crim.App. 2006) (death appropriate penalty for defendant convicted of murder committed during the course of a burglary); and Hunt v.State, 659 So.2d 933 (Ala.Crim.App. 1994) (death appropriate penalty for defendant convicted of murder made capital because it was committed during the course of a burglary and sexual abuse).
For the reasons set forth above, Marshall's conviction and sentence of death by lethal injection are affirmed.
AFFIRMED.
BASCHAB, P.J., and McMILLAN, SHAW, and WISE, JJ., concur.
[1] A person commits sexual abuse in the second degree if he, being 19 years old or older, subjects another person who is less than 16 years old but more than 12 years old, to sexual contact. § 13A-6-67(a)(2), Ala. Code 1975.
[2] If Marshall had been arrested the night of December 28, the arrest would have been illegal. He was arrested without a warrant and no probable cause existed at that time to justify an arrest.
 "Probable cause to support a warrantless arrest must exist at the time of the arrest. Davis v. State, 507 So.2d 1023 (Ala.Crim.App. 1986). Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime. United States v. Rollins, 699 F.2d 530 (11th Cir.) cert. denied, 464 U.S. 933, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). `In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. . . .' Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1891 (1949). `"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." `Id. `Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest.' Cox v. State, 489 So.2d 612 (Ala.Crim.App. 1985). The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause. Stone v. State, 501 So.2d 562
(Ala.Crim.App. 1986). `"[P]robable cause may emanate from the collective knowledge of the police. . . ." `Ex parte Boyd, 542 So.2d 1276, 1284
(Ala. 1989) (citations omitted)." Dixon v. State, 588 So.2d 903, 906 (Ala. 1991). At the time Marshall went to city hall, the police were investigating a missing teenager. Other than a VCR discovered in the victim's apartment that had not been there before her mother left for work that morning, there was no evidence to connect Marshall to a crime. In fact, at the time Marshall went to city hall, police did not even know whether a crime had in fact been committed. Not until the investigation revealed Alicia's belongings in a dumpster near Marshall's apartment did law-enforcement officers have probable cause to obtain the warrant for Marshall's arrest. Therefore, if Marshall had been arrested the night of December 28, the arrest would have been illegal.
[3] Section 13A-7-5(a), Ala. Code 1975, was amended effective June 1, 2006. See Act No. 2006-198, Ala. Acts 2006.